**CURTIS PUBLISHING COMPANY,**
Appellant,

v.

**Wallace BUTTS, Appellee.**

**Wallace BUTTS, Appellant,**

v.

**CURTIS PUBLISHING COMPANY,**
Appellee.

**No. 21491.**

United States Court of Appeals
Fifth Circuit.

July 16, 1965.

Rehearing Denied Oct. 1, 1965.

See also, D.C. 242 F.Supp. 390.

Welborn B. Cody, Harold E. Abrams, Atlanta, Ga., Philip H. Strubing, Philadelphia, Pa., Emmet J. Bondurant, Thomas E. Joiner, Atlanta, Ga., Kilpatrick, Cody, Rogers, McClatchy & Regenstein, Atlanta, Ga., Pepper, Hamilton & Scheetz, Philadelphia, Pa., of counsel, for appellant.

William H. Schroder, Allen E. Lockerman, Milton A. Carlton, Jr., Robert L. Pennington, Gerald P. Thurmond, T. M. Smith, Jr., Atlanta, Ga., Troutman, Sams, Schroder & Lockerman, Atlanta, Ga., of counsel, for appellant on Cross Appeal.

Before RIVES and BROWN, Circuit Judges, and SPEARS, District Judge.

SPEARS, District Judge:

This is a libel suit. Curtis Publishing Company[1] published an article in the March 23, 1963 issue of the Saturday Evening Post[2] entitled "The Story of a College Football Fix", characterized by the Post in the sub-title as "A Shocking Report of How Wally Butts and 'Bear' Bryant Rigged a Game Last Fall."

On March 25, 1963, Wally Butts,[3] former Athletic Director of the University of Georgia, instituted this action against Curtis. In August, 1963, the case was heard before a jury, which returned a verdict against Curtis for $60,000 general and $3,000,000 punitive damages. Conditioned upon the failure of Butts to remit that portion of the award for punitive damages in excess of $400,000, the trial court granted Curtis' motion for new trial. At the same time, Curtis' motion for judgment notwithstanding the verdict was denied. On January 22, 1964, after Butts had filed a remittitur, Curtis' motion for new trial was denied, and judgment for Butts in the amount of $460,000 was entered. Thereafter, Curtis filed motions for new trial under Rule 60(b), F.R.Civ.P., which were denied on April 7, 1964. This appeal is taken from the judgment of January 22, 1964, and from the trial court's denial of Curtis' motions for judgment notwithstanding the verdict and for new trial. We affirm.

Curtis publishes various magazines including the Post. Prior to the publication of the story in question, the editor-in-chief, undoubtedly hoping to attract more readers, had decided to "change the image" of the magazine by making it an "exposé" type, and embarking upon a policy of "sophisticated muckraking", in order "to provoke people" and "make them mad".[4]

The article[5] involved was based upon a claim by one George Burnett that on September 13, 1962 he had accidentally overheard, and made notes of, a long-distance telephone conversation between

---

1. Hereinafter referred to as either "Curtis", "defendant" or the "Post".

2. Also referred to herein as the "Post".

3. Sometimes hereinafter referred to as "Butts" or "plaintiff".

4. See note 25, infra.

5. The following editorial comment was inserted at the beginning of the story:
 "Not since the Chicago White Sox threw the 1919 World Series has there been a sports story as shocking as this

Butts and "Bear" Bryant, football coach at the University of Alabama, in which Butts divulged certain information about football plays the University of Georgia would use in its opening game against Alabama. Georgia was subsequently defeated 35-0.

About four months after the alleged telephone conversation Burnett contacted various people, including Georgia football coach Johnny Griffith, and then decided to tell his story to the Post. A writer, Frank Graham, Jr., was assigned by the Post to investigate and write the story, and an Atlanta sports editor was retained to advise him. Graham never saw Burnett's notes, as they were at the time in the possession of Georgia school officials; he did not interview a witness known by him to have allegedly discussed the notes with Burnett on the same day the telephone conversation purportedly took place; he never viewed the game films; and neither he nor anyone else on behalf of the Post ever contacted Butts or Bryant. He agreed that both he and Curtis knew publication of the article "would ruin Coach Butts' career".

On March 11, 1963, eleven days before the article was published, Curtis was informed by telegram and letter, both sent by Butts' counsel, of the "absolute falsity of the charges" contained in the proposed story. The record does not disclose that any additional investigation was initiated, and the telegram and letter went unanswered. In addition, a long-distance telephone appeal that the article not be published, made by Butts' daughter prior to publication, was rejected. After the article was published, Curtis refused a demand that it publish a retraction.

The Post took the position from the beginning that the statements made in the article concerning Butts were true, and that because of their nature it had exercised great care by thoroughly checking every significant source of information as to their truthfulness and accuracy, in advance of publication.

Curtis chose not to use as a witness either the author of the article or any of its editors who had made contributions to the article after it had been submitted. Nor did it use the Atlanta sports editor who had assisted in the preparation of the story. As one of its principal witnesses it called upon George Burnett, who was known by Curtis to have been convicted of writing bad checks, and to be on probation at the time he claimed to have listened in on the conversation.

Both Butts and Bryant testified. Each emphatically denied the charges contained in the article and stated that there was never any conversation between them having as its purpose the fixing or rigging of any football game. Several football players, past and present, expressed their opinions to the effect that the outcome of a football game cannot be rigged or fixed without participation by the players themselves, and that there is no way in which two coaches can rig or fix the outcome of a football game without the players' knowledge. Other

one. This is the story of one fixed game of college football.

"Before the University of Georgia played the University of Alabama last September 22, Wally Butts, athletic director of Georgia, gave Paul (Bear) Bryant, head coach of Alabama, Georgia's plays, defensive patterns, all the significant secrets Georgia's football team possessed.

"The corrupt here were not professional ballplayers gone wrong, as in the 1919 Black Sox scandal. The corrupt were not disreputable gamblers, as in the scandals continually afflicting college basketball. The corrupt were two men—Butts and Bryant—employed to educate and to guide young men.

"How prevalent is the fixing of college football games? How often do teachers sell out their pupils? We don't know—yet. For now we can only be appalled.—THE EDITORS."

In the story itself it is stated, among other things, that "(t)he Georgia players, their moves analyzed and forecast like those of rats in a maze, took a frightful physical beating". Georgia coach Johnny Griffith was quoted as saying bitterly to a friend, "I never had a *chance*." The next sentence read: "When a fixer works against you, that's the way he likes it."

"experts" stated their opinion that the information contained in the "so-called" Burnett notes would not be of any assistance at all to the University of Alabama in preparing for its game with the University of Georgia. In several instances Butts' witnesses denied direct quotations attributed to them in the article.

In an opinion written by the district judge the facts are stated in some detail,[6] and no useful purpose could be served by repeating them here, although portions thereof pertinent to specific issues later discussed may be utilized. It is significant, however, at this point, to say that in view of the verdict it rendered, the jury undoubtedly accepted Butts' version that the story was "willfully, maliciously and falsely" published, as a result of which he has suffered substantial injury to his "peace, happiness and feelings", as well as to his "honor, reputation and integrity". As the trial judge saw it: "The article was clearly defamatory and extremely so. * * * The guilt of the defendant was so clearly established by the evidence in the case so as to have left the jury no choice but to find the defendant liable."[7] We wholeheartedly agree with that appraisal.

### THE ISSUES PRESENTED

Curtis submits twenty-eight specifications of error which are argued in its brief under ten propositions. The issues involved are: (1) Was the article libelous per se? (2) Does the court's judgment violate Curtis' rights under the First, Fifth and Fourteenth Amendments? (3) Did the arguments of Butts' counsel, not objected to at the trial, require a new trial? (4) Did the court err

in excluding certain testimony offered to impeach the credibility of Butts and the witness John Carmichael? (5) Were the extrajudicial statements of George Burnett, and the statements made to him by third person, properly excluded? (6) Did the trial court commit plain error in instructing the jury? (7) Did the trial court err in refusing to charge the jury that it should construe Butts' testimony "most strongly against him"? (8) Did the trial court err in refusing to charge the jury that it should disregard the entire testimony of any witness whom it found to have knowingly and wilfully testified falsely? (9) Does the "newly discovered evidence" offered in Curtis' motion under Rule 60(b), F.R.Civ.P. require a new trial? (10) Is the award of punitive damages so excessive that it cannot be cured by the remittitur?

### THE ARTICLE AS LIBELOUS PER SE

The trial judge charged the jury that the article was libelous per se. This was objected to by Curtis on the ground that Butts was not actively engaged in the profession of a football coach at the time of publication, and, that no special damage was shown.[8] Curtis took the same position in its motions for directed verdict and for judgment notwithstanding the verdict.

Curtis' contention in this regard cannot be sustained. This is a *libel* suit as distinguished from a *slander* suit.[9] Under Georgia law, a plaintiff may recover in a libel action where the defamation is apparent from the writing itself, without the necessity of alleging or proving special damages,[10] and it is

---

6. Butts v. Curtis Publishing Co. (N.D.Ga. 1964), 225 F.Supp. 916.

7. Id. at 919.

8. In support of this proposition, Curtis cites—Weatherholt v. Howard, 143 Ga. 41, 84 S.E. 119 (1915); Van Epps v. Jones, 50 Ga. 238 (1873); Mell v. Edge, 68 Ga.App. 314, 22 S.E.2d 738 (1942); Haggard v. Shaw, 100 Ga.App. 813, 112 S.E.2d 286 (1959); and Estes v. Sterchi Bros. Stores, 50 Ga.App. 619, 179 S.E. 222 (1935). These cases, however, ap-

pear to be "delinquent debtor cases" referred to in note 11, infra.

9. Ga.Code Ann. § 105-701 (libel), § 105-702 (slander).

10. Floyd v. Atlanta Newspapers, Inc., 102 Ga.App. 840, 117 S.E.2d 906 (1960), the leading case in Georgia, states that words which, if merely spoken, would not be actionable in absence of special damage, may be libelous when printed if false and tend to injure reputation and bring one into public hatred, contempt or ridicule. Ordi-

not necessary that he be engaged in the pursuit of his trade, business or profession at the time of publication.[11]

■ But even if the law necessitated a showing that Butts was actively engaged in the profession of a football coach at the time of publication, we think this requirement has been satisfied.

The story was purchased by Curtis on February 22, 1963. Butts resigned as Athletic Director effective February 28, 1963. The article was published in the March 23, 1963 issue of the Post. Thus it may be assumed that Butts was at least temporarily out of work on the day of publication, but it hardly follows that he had completely abandoned the coaching business.

Actually, Curtis admitted in its answer that Butts "has enjoyed a national reputation as a successful and respected member of the coaching profession", and that he "has been approached and offered employment as head football coach by several colleges and professional football teams in the country due entirely to his reputation as a successful member and leader in his profession." This admission, in and of itself, would indicate a recognition that Butts was still identified with some phase of football activities.

■ Upon Curtis' insistence, its second defense asserting that the statements contained in the article were true, was held to be a valid plea of justification. By interposing this plea, Curtis admitted a prima facie case,[12] but gained the valuable right to open and close. The complaint alleged that "plaintiff's career *as a member of the football coaching profession* had been ruined and destroyed by this scurrilous and contemptible defamation." (Emphasis supplied.) Without regard to any question as to whether the plea constitutes an admission that the remarks were made with malice, it is our

narily, only general damages need be alleged in an action for libel.

11. Ga.Code Ann. § 105–701, defines libel as the "false and malicious defamation of another, expressed in print * * * tending to injure the reputation of an individual and exposing him to public hatred, contempt, or ridicule * * *", without the requirement that the charges be calculated to injure one in his trade, office or profession. A newspaper libel is described in Ga.Code Ann. § 105–703, as being "[a]ny false and malicious defamation of another in any newspaper, magazine or periodical tending to injure the reputation of any individual and expose him to public hatred, contempt, or ridicule", again without the requirement that the charges refer to one's trade, office or profession. Only in the area of slander is a reference to one's trade, office or profession required. Ga.Code Ann. § 105–702.

The case of Floyd v. Atlanta Newspapers, Inc., supra, note 10, in its definitive statement of the Georgia law of libel explains that written words are sufficient to constitute libel per se if they tend to bring a man into public hatred, contempt or ridicule. Damages will be presumed from the nature of the words themselves and their harmful effect and no proof of special damages is necessary. Where the only possible construction is that the words are libelous per se, upon proof thereof, the only remaining question for the jury is that of damages. See also Restatement of the Law Second, Torts, Tentative Draft No. 11, April 15, 1965, Section 569, wherein Georgia is named as one of the majority of states following this rule, and, as explained in the notes to Restatement of the Law of Torts, 1938, Vol. III, Sec. 569, Comment e, pp. 168–9, it may be libelous to impute misconduct in one's trade, etc., although he is at the time no longer engaged in the pursuit of the trade, business or profession.

Curtis cites many cases in support of its position (see note 8, supra). However, these are part of a group of cases known in Georgia as the "delinquent debtor cases", and, as explained by the Floyd case, stand in a class by themselves, and have no bearing on causes of action other than those involving charges that one owes a debt and refuses to pay, or owes a debt long past due. In this isolated situation the charge is, as a matter of law, uniformly held in Georgia, not libelous per se, and it is in these cases that Curtis finds language to the effect that falsely spoken or written words that do not contain a charge made in reference to one's trade, office or profession are not actionable without proof of special damages.

12. See Ga.Code Ann. § 105–708 and § 105–1801; see also Baldwin v. Davis, 188 Ga. 587, 590, 4 S.E.2d 458 (1939).

view that it necessarily carries with it an admission, not only that the libelous statements were made by Curtis, but also that they were made in relation to Butts "as a member of the football coaching profession". Under all the circumstances, it is untenable to say that simply because Butts was temporarily out of a job at the time of publication, he was not actively engaged in the coaching business as a means of livelihood.[13]

■ We hold that the trial court correctly charged the jury that the article was libelous per se, and that he did not err in denying Curtis' motions for a directed verdict and for judgment notwithstanding the verdict.

## CURTIS' CONSTITUTIONAL RIGHTS

Curtis contends that the trial court's judgment violates and abridges its rights of freedom of speech and of the press guaranteed by the First, Fifth and Fourteenth Amendments to the Constitution of the United States. It relies upon the case of New York Times Company v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), decided subsequent to the trial of this case, in which it was held that in order for a public official in a libel suit to recover any damages he must prove that a statement against his official conduct was published "with actual malice—that is knowledge that it was false or with reckless disregard of whether it was false or not". 376 U.S. at 279–280, 84 S.Ct. at 726. This holding, says Curtis, "drastically changed the constitutional principles applicable to libel actions", by announcing new safeguards which "make it manifestly clear not only that the rules of law which were applied in the trial of the instant case were unconstitutional, but also that the result reached by the jury is a patently unconstitutional result which cannot be permitted to stand".

Countering this, Butts says that the invocation of the constitutional defenses in libel cases has received emphatic and substantial attention by scholars and Courts over the years; that the Times case resulted in no fundamental change of law, but merely gave new sanctions to a long standing rule; and that in any event, Curtis did not invoke those defenses even though they are more broadly stated in the Georgia law than in the Times case.[14] Moreover, Butts emphasizes that the Times' constitutional grounds now asserted were not timely raised or preserved below. In fact, they were presented for the first time in the F.R.Civ.P. 60(b) motion filed on March 23, 1964, long after trial.

The record reflects that Curtis did not object to the trial court's instructions.[15]

---

13. In the Missouri case of Clark v. McBaine, (1923), 299 Mo. 77, 252 S.W. 428 at 432, cited by Curtis, the Court stated that though the plaintiff "had been removed as a member of the faculty, * * * his profession, or means of a livelihood, was still that of a professor of law, and a writer of textbooks upon the law, and the gist of his damages * * * consisted of injury done to his standing as a professor and writer of law."

14. In support of his position, Butts cites: "Justice Black and First Amendment 'Absolutes', A Public Interview," 37 N.Y. U.L.Rev. 349 (1962); C. L. Black, Jr., "Mr. Justice Black, the Supreme Court, and the Bill of Rights," Harpers, February, 1961, p. 63; Caldwell v. Crowell-Collier Pub. Co., (5th Cir. 1947), 161 F. 2d 333; Sweeney v. Schenectady Union Pub. Co., (2d Cir. 1941), 122 F.2d 288, aff'd 316 U.S. 642, 62 S.Ct. 1031, 86 L. Ed. 1727 (1942); Henry v. Collins, 158 So.2d 28 (Miss.1963); Louisiana v. Garrison, 244 La. 787, 154 So.2d 400 (1963); Louisiana v. Moity, 245 La. 546, 159 So. 2d 149 (1963); and other pre-Times defamation cases. He points out that the Supreme Court in Times recognizes that "a like rule" has existed for a number of years in some state courts; that the Kansas Supreme Court, in Kennedy v. Mid-Continent Telecasting, Inc., 193 Kan. 544, 394 P.2d 400 (Kan.1964), noted that the Times decision requires no change in the law; that the trial court said (note 23, infra) that Georgia provides this "like rule" by a statute granting a qualified privilege for "[c]omments upon the acts of public men in their public capacity and with reference thereto", citing Ga.Code Ann. § 105–709(6); and that privilege can be lost by proof of actual malice, citing Ga.Code Ann. § 105–710.

15. See Rule 51, F.R.Civ.P. Also see note 36, infra.

The Times case was decided by the Alabama Supreme Court on August 30, 1962. A petition for writ of certiorari presenting constitutional questions identical to those now being urged by Curtis, was filed in the United States Supreme Court on November 21, 1962, four months prior to the filing of the complaint in this case on March 25, 1963.[16] Certiorari was granted in the Times case on January 7, 1963. The jury verdict in the instant case was returned on August 20, 1963, and the trial court's judgment thereon was entered the same day. A Birmingham, Alabama law firm, which represented the New York Times in the case brought against it by Sullivan, also, together with Curtis' General Counsel, represented Curtis in a libel suit Coach Bryant had filed against it in the United States District Court at Birmingham, Alabama. A member of this law firm had sent information to Curtis about the alleged telephone conversation between Butts and Bryant, and had talked with the author, Graham, about the matter prior to publication of the story. The same lawyer, together with another member of the firm, sat (as did the General Counsel for Curtis) at Curtis' Counsel table throughout the trial of this case.[17]

While it is true that the Supreme Court did not decide the Times case until March 9, 1964, it would be contrary to reason and common sense to assume that there had not been, at all times during the pendency of this case, full communication among Curtis' counsel, particularly concerning trial strategy. The facts more than justify our conclusion that Curtis was fully aware when this suit was instituted, and certainly no later than the beginning of trial, that the constitutional questions it now argues had been for some time, and were still being, vigorously asserted in Times.

The Supreme Court said, in Michel v. State of Louisiana, 350 U.S. 91, 99, 76 S.Ct. 158, 160, 100 L.Ed. 83 (1955), that "(t)he test (in making a claim to a constitutional right) is whether the defendant has had 'a reasonable opportunity to have the issue as to the claimed right heard and determined by the * * * court.'" It then cited the case of Yakus v. United States, 321 U.S. 414, 444, 64 S.Ct. 660, 677, 88 L.Ed. 834 (1944), for the proposition that "(n)o procedural principle is more familiar to this Court than that a constitutional right may be forfeited * * * by the failure to make timely assertion of the right."[18]

16. We have examined the petition for writ of certiorari presenting the constitutional questions, and find that it was filed by the New York Times Company on November 21, 1962. The brief for respondent in opposition was filed on December 15, 1962, and petitioner's reply thereto was filed on December 29, 1962.

17. The Birmingham law firm of Beddow, Embry and Beddow, which represented the New York Times in the Supreme Court of Alabama, is also shown to be counsel for the Times in the Supreme Court of the United States. Mr. Roderick Beddow of that firm represented Curtis in the case of Paul Bryant v. Curtis Publishing Company, in the United States District Court in Birmingham, and both he and Mr. T. Eric Embry of that firm sat, along with the General Counsel of Curtis, Mr. Philip H. Strubing, at the Curtis counsel table throughout the trial of this case. Butts' brief states, without contradiction, that Mr. Beddow "initially 'sent them (Curtis) this information' about the alleged telephone conversation and was a principal in the initial work of the author Frank Graham."

18. Michel v. State of Louisiana, 350 U.S. 91, 76 S.Ct. 158, 100 L.Ed. 83 (1955), involved a Louisiana statute requiring any challenge to the composition of a Grand Jury to be made before the end of the term of the Grand Jury, holding that the statute was not unconstitutional, and that since the petitioners had not, under that statute, made timely challenge to the constitutional composition of the Grand Jury, they waived any such right to so challenge the Grand Jury. The court announced that the test was whether the defendant had had a reasonable opportunity to have the issue as to the claimed right heard and determined by the court. On the other hand, in the case of Reece v. State of Georgia, 350 U.S. 85, 76 S.Ct. 167, 100 L.Ed. 77 (1955), decided at the same time as the Michel case, the state

It cannot be said that this case falls within the category of those cases cited by Curtis [19] which hold that if subsequent to a trial or hearing, but before a final decision by the trial or appellate court, the fundamental law is changed, it is the duty of the court to apply the law as amended. Those were "exceptional cases", where there was no waiver and the court was satisfied that to do otherwise would result in a "plain miscarriage of justice". In this case, however, even if it is assumed that the basic law has been changed, the situation is quite different. For whatever tactical or other reason [20] Curtis sat back and failed to carry the constitutional torch before verdict and judgment, the fact remains that it was charged with knowledge, through its interlocking battery of able and distinguished attorneys, of the issues involved in the Times case, and was afforded every reasonable opportunity to have those same issues heard and determined by the trial court in the case at bar. What the Supreme Court would, or might, hold in Times was not decisive. What was important was that Curtis had to invoke any constitutional claims in an appropriate way, and at an appropriate time. Considering the resources of Curtis, both practical and legal, and the contemporary awareness of constitutional rights pervading even problems of local jurisprudence, Curtis' complete and utter silence amounted to "an intentional relinquishment or abandonment of a known right or privilege." [21]

Without expressing any opinion as to whether Times fundamentally changed the substantive law applicable to libel cases, or whether the charge on malice given by the trial court was adequate under Times,[22] or whether Butts was the

court had refused to consider the defendant's motion to quash the indictment filed before his arraignment on the ground of the composition of the Grand Jury, because, by Georgia practice, objections to the Grand Jury must be made before the indictment is returned. The court held that there had been no waiver there, and that due process had been violated, because defendant, a semi-illiterate Negro, had no counsel until the day after his indictment, pointing out that "the right to object to a grand jury presupposes an opportunity to exercise that right."

In Kewanee Oil and Gas Co. v. Mosshamer, (10th Cir. 1932), 58 F.2d 711, where the constitutionality of a state statute was raised on appeal, the court held that if the constitutionality of a statute is not raised in the pleadings ordinarily it may not be raised at the trial.

Other cases decided by district courts, and holding that constitutional questions ordinarily must be raised at the trial, are: Alexander v. Daugherty (D.C.Wyo. 1960), 189 F.Supp. 956 (only where failure to raise the constitutional question at the trial was due to ignorance, duress or other reason for which petitioner could not be held responsible, may redress be had, and then if "it is made to appear that there had been such gross violation of constitutional right as to deny the defendant the substance of a fair trial") ; Houck v. Eastchester P. U. District (D.C.Alaska 1952), 104 F.Supp. 588, 13 Alaska 674; Mount Tivy Winery v. Lewis (N.D.Cal. 1942), 42 F.Supp. 636 ; and White Cleaners and Dyers v. Hughes (W.D.La.1934), 7 F.Supp. 1017.

19. Ziffrin, Inc. v. United States, 318 U.S. 73, 63 S.Ct. 465, 87 L.Ed. 621 (1943); United States v. Schooner Peggy, 5 U.S. (1 Cranch) 103, 2 L.Ed. 49 (1801); and Hormel v. Helvering, 312 U.S. 552, 61 S.Ct. 719, 85 L.Ed. 1037 (1941), an unusual case in which the Supreme Court allowed the Tax Commissioner to assert for the first time on appeal in the Court of Appeals the taxability of income under another section of the code, but stated that "(o)rdinarily an appellate court does not give consideration to issues not raised below * * * (but) (t)here may always be exceptional cases * * * where injustice may otherwise result * * *" except where an express waiver has been made.

20. Butts thinks it can be inferred that "defendant never considered plaintiff to be in any class of 'public men' so as to make the defense available."

21. Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).

22. The trial court's charge on malice was, in part, as follows:
"At this point, I think it is well that I should explain to you the meaning of malice under the law of defamation, Malice, in the law of defamation, may be used in two senses. First, in a special

kind of "public official" contemplated by Times,[23] or whether a reversal might otherwise be required if the constitutional issues had been timely presented,

or technical sense to denote absence of lawful excuse or to indicate absence of privileged occasion. Such malice is known as implied malice or malice in law. There is no imputation of ill will to injure with implied malice. Secondly, malice involving intent of mind and heart or ill will against a person is classified as express malice or malice in fact * * *

"Where it is established that the defendant was inspired by actual malice in the publication of the defamatory matter, the jury, in its discretion, may, but is not required, to award punitive damages. As previously stated to you, actual malice encompasses the notion of ill will, spite, hatred, and an intent to injure one. Malice also denotes a wanton or reckless indifference or culpable negligence with regard to the rights of others. The purpose of punitive damages is to deter the defendant from a repetition of the offense and is a warning to others not to commit a like offense. It is intended to protect the community and has an expression of ethical indignation, although the plaintiff receives the award. The plaintiff charges that the column was written and published both with actual malice and in utter and wanton disregard of his rights * * *."

23. In a second opinion dated April 7, 1964 (See Butts v. Curtis Publishing Company (N.D.Ga.1964) 242 F.Supp. 390, at 393), denying Curtis' motions under Rule 60(b), the trial judge gave the following as his views concerning Butts' status as a "public official":

"In the present motion at hand, the defendant contends that plaintiff's action comes under the Times ruling in that plaintiff was a public official, and that the verdict and judgment was awarded plaintiff as damages for injury to his reputation as a football coach on account of a publication made by the defendant concerning plaintiff's actions while acting as Director of Athletics at the University of Georgia. In the trial of the case, movant defended the action by entering a plea of justification, and no defense was made or evidence introduced concerning Butts' position as Athletic Director or as a public official. Georgia law provides under certain conditions communications concerning the acts of public men in their public capacity and reference therewith to be deemed privileged. Georgia Code Annotated, Section 105–709(6). Just where in the ranks of government employees the 'public official' designation

extends, the Supreme Court in the Times case did not determine. The decision did determine that Sullivan, as an elected city commissioner of Montgomery, fitted into the category of public officials.

"Under Georgia law, members of the Board of Regents of the University System are public officials. Georgia Sessions Laws, 1931, Pages 7, 45. The evidence presented at the trial shows that plaintiff was Director of Athletics at the University for some two years prior to February, 1963, at which time he resigned. The article complained of was published in the defendant's issue of March 23, 1963. The Board of Regents at both the University of Georgia (located in Athens) and the Georgia School of Technology (located in Atlanta) control the athletic programs of the two institutions, but the details are handled at each institution by an athletic association composed of faculty members and alumni, and each is incorporated to facilitate such business transactions as improvement of athletic grounds and equipment at the two institutions. The schedule of athletic contests for each year is approved by the faculty and by the Regents. The separate athletic associations at both institutions are wholly under the control of the Regents and are their agents. For further details of the athletic setup, see Page v. Regents of University System of Georgia, 93 F.2d 887, 891–892. As was stated in the Page case, the 'coaches' are also members of the faculty.

"Plaintiff Butts was Director of Athletics at the University. The Athletic Director, along with the various coaches in the Athletic Department, were employed by the separate incorporated athletic association. However, the defendant seeks by this motion to extend the category of 'public officials' to one employed as agent by the University of Georgia Athletic Department. Even if plaintiff was a professor or instructor at the University, and not an agent of a separate governmental corporation carrying on 'a business comparable in all essentials to those usually conducted by private owners' he would not be a public officer or official. Under Georgia law, the position of a teacher or instructor in a State or public educational institution is not that of a public officer or official, but he is merely an employee thereof. Regents of the University System of Georgia v. Blanton, 49 Ga.App. 602(4), 176 S.E. 673; Board of Education of

we hold that Curtis has clearly waived any right it may have had to challenge the verdict and judgment on any of the constitutional grounds asserted in Times.

## THE ARGUMENTS OF COUNSEL

Curtis contends that the jury arguments of Butts' counsel constituted "sig-

Doerun v. Bacon, 22 Ga.App. 72, 95 S.E. 753. To hold plaintiff, an employee of the University Athletic Association, a public official would, in this Court's opinion, be extending the 'public official' designation beyond that contemplated by the ruling in the case of New York Times Company v. Sullivan, supra."

See also: Martin v. Smith, 239 Wis. 314, 1 N.W.2d 163, 140 A.L.R. 1063.

The case of Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), cited in the Times case, held that in the reciprocal situation where two government employees were suing the director of an important United States Government agency for his alleged libelous conduct, the director, a public official, has absolute privilege, regardless of the existence of malice, in defense of the alleged libel, although his conduct was within the outer perimeter of his line of duty. The policy of this position is to aid in the effective functioning of government by assuring that government officials shall be free to exercise their duties without fear of damage suits with respect to acts done in the course of those duties.

In cases decided since the Times case, the "public official" designation has not been extended. The court, in the case of Garrison v. State of Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (Nov. 1964), in reversing the conviction of the New Orleans Parish District Attorney for the criminal defamation of eight judges of the Criminal District Court of the Parish of New Orleans, stated that "the public official rule protects * * * a free flow of information to the people concerning public officials, their servants * * *", whatever touches upon "an official's fitness for office is relevant. * * * [A] candidate must surrender to public scrutiny and discussion so much of his private character as affects his fitness for office." Justice Goldberg, in his concurring opinion, stated that "libel * * * on the official conduct of the governors (of the people) * * * can have no place in our Constitution."

nificant and fundamental errors which the court may notice without objection".

The record reflects that Curtis was represented at the trial by several attorneys. One argument for each side was made on Friday and the remaining arguments were completed the following Monday. Much of the argument of which

The Second Circuit, in Pauling v. News Syndicate Company, Inc. (2nd Cir. 1964), 335 F.2d 659, considered the possible extensions of the doctrine of the Times case, stating that a candidate for public office would seem an inevitable candidate for extension, and that once an extension is made, the participant in public debate on any issue of grave public concern would be next in line. Quoting the Times case, the court then said: "(t)he 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open,' now applied to confer immunity on 'vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials,' * * * may some day be found to demand still further erosion of the protection heretofore given by the law of defamation."

The Henry v. Collins and Henry v. Pearson cases, 380 U.S. 356, 85 S.Ct. 992, 13 L.Ed.2d 892 (1965), reversed a judgment for the plaintiffs on the ground that the lower court's charge to the jury on malice was error under the Times and Garrison cases, thus indicating that a County Attorney and a Chief of Police would come within the privilege. Justices Black, Douglas and Goldberg concurred, not due to the error in the charge, but on the ground that such a suit would violate the First and Fourteenth Amendments under the Times case, where the defendant published his criticism of the plaintiffs' performance of their public duties.

This court in Buckley v. The New York Times (5 Cir. 1964), 338 F.2d 470, after deciding the case on procedural grounds, stated in dicta that "a judicial determination by this Court of the proposition * * * that the principle of (the Times case) should be extended to candidates for public office, must await an appropriate case."

For other cases decided by district courts, see: Smoot v. League of Women Voters of the Grand Traverse Area (W.D.Mich. 1964), 36 F.R.D. 4; and H. O. Merren & Co., Ltd. v. A. H. Belo Corp. (N.D. Tex.1964), 228 F.Supp. 515.

complaint is now made was offered on Friday. Yet, no objection to any portion of the arguments was raised until Curtis filed its motion for new trial nine days after the jury verdict was returned.

The trial court correctly disposed of this matter in the following language:

"It is an elementary principle of federal law that a new trial will not be granted where a party seeks to raise for the first time, on a motion for a new trial, (the objection) that opposing counsel was guilty of misconduct in his argument to the jury, where such conduct was not excepted to during the trial." [24]

If, as Curtis' counsel now claim, the arguments were, among other things, "grossly improper and inflammatory", "intemperate and inexcusable", appeals to passion and prejudice", "corruptions of the evidence", "completely unsupported by the evidence", and "unsworn testimony of counsel", it is inconceivable to us that they would have delayed so long without raising the slightest hint of an objection. Leeway must often be allowed counsel in objecting to argument lest the objection itself magnify the harm. But to say nothing during argument, the

extended week end recess, and for nine days thereafter, leaves us with the conviction that they did not consider the arguments objectionable at the time they were delivered, but made their claim as an afterthought.

Furthermore, after carefully considering the entire record, we do not consider that the arguments belatedly objected to would have required a reversal, even if timely objections had been made. Some of the argument was invited, but the very nature of the case made it virtually impossible to discuss the evidence free of emotion or drama. The editor-in-chief of the Post set the tone and the stage for the attack. He openly boasted that the Post's new policy of "sophisticated muckraking" was the "final yardstick" of editorial achievement since it meant "we are hitting them where it hurts." It was no wonder that the author Graham was equally callous in admitting that he knew that "when this article was published that was the death of Wally Butts in his chosen profession" and that "Curtis Publishing Company knew that when that article was published it would ruin Coach Butts' career." The policy of the magazine so bluntly stated [25] was by itself more than

24. Supra note 6, 225 F.Supp. at 922. See also: Fidelity & Casualty Co. of New York v. Williams (5th Cir. 1952), 198 F.2d 128.

25. In the deposition of Clay D. Blair, Jr., editor-in-chief, it was developed that for the first quarter of 1963, Curtis showed a loss of about $1.1 million, compared to a loss in 1962 for the same quarter of $4.7 million; that in 1960 the amount of advertising revenue was $106 million; that in 1961 the figure had dropped to $86 million; that Blair was made a vice-president of Curtis in June of 1962; that circulation is one of the factors that affects advertising revenues; that demography is important, because "all circulation in Russia would not be appealing to General Motors;" that Blair wrote a memo to his staff, which found its way to a national magazine, in which he was quoted as saying: "The final yardstick is the fact that we have about six lawsuits pending, meaning that we are hitting them where it hurts, with solid, meaning-

ful journalism"; that he was not being facetious when he used the phrase "sophisticated muckraking"; that he meant it when he said it and when he testified; that he was correctly quoted as being "concerned with the image of the Post and in trying to get a new image, portray a different type of magazine"; that he did change the image of the Post; that the Butts issue was representative of the new type magazine Curtis was interested in publishing; that "we have perhaps come * * * 25 per cent of the way with this issue * * * toward the goal of the magazine that I envision"; that this issue is a step in the right direction; that he was acquainted with the term "muckraking" prior to using it in the interview which led to an article in Newsweek on November 19, 1962; that in the interview with Newsweek he stated that he intended to "restore the crusading spirit * * * the sophisticated muckraking, the expose in the mass magazines * * * to provoke people, make them mad"; that he further stated

enough to inflame the jury. Counsel for Butts could only gild the lily.[26]

## THE EXCLUSION OF TESTIMONY

Butts was asked by Curtis' counsel on cross-examination if he recalled having made a statement over television, on a date prior to the institution of this action, that he "would never at any time and never * * * (had) done anything that would injure the University of Georgia". He responded that he had made a statement to that effect, but that "as far as my services at the University of Georgia are concerned that represents only my opinion". Proffered evidence which Curtis asserts "is replete with incidences of Butts' unfaithfulness and disloyalty to the University of Georgia", was excluded by the trial court. Curtis insists, however, that the evidence should have been admitted, not only to demonstrate Butts' true character, but to impeach his credibility as a witness.

We are in agreement with the trial court that proof of Butts' character could be made by reputation only, and that particular acts of misconduct are irrelevant.[27]

The rule that "[a] party may be cross-examined to bring out matters, even though they may be collateral, which are inconsistent with the testimony given by him",[28] is not applicable here. The answer given by Butts to the question asked by Curtis' counsel concerning a statement previously made out of court, was not such an affirmative profession of faithfulness and loyalty to the University of Georgia, made at the trial, as would open the door, for the purpose of impeachment, in mitigation of damages, or otherwise, to the admission of alleged incidents of "unfaithfulness and disloyalty" to that institution, either by cross-examination of Butts, or by direct evidence from other witnesses.

Complaint is made that Curtis was not permitted to show that Butts had refused to answer certain questions in his deposition, and that evidence offered as to purportedly false testimony given by Butts in his deposition was rejected. Butts refusal to answer was on advice of counsel. The answers sought were subsequently supplied, but Curtis argues that because of the delay it was denied adequate discovery and thereby "lost valuable time in the preparation of its case".

The trial judge was clothed with broad discretion in controlling the extent of direct and cross-examination,[29] and we cannot say that he abused that discretion in excluding the proffered evidence.

Similarly, we do not think the trial court abused his discretion in refusing to admit evidence that the witness Carmichael, while a minor in Ohio, had been convicted of petty larceny in 1933.

---

in the interview: "But careers will be ruined, that is sure", and he could not quarrel with the fact that Butts' career was one of the careers to which reference was made in that statement.

26. The trial court also pointed out that Butts was unquestionably one of the leading figures in the national football picture; that responsible officials of the Post knew that after the article was published Butts' career would be ruined; that Butts, through his attorney, had notified Curtis before publication that the article was false; that one of Butts' daughters had telephoned long distance to a Post official with a plea that the article be withheld from publication; and that after publication Butts had, pursuant to Georgia law, requested a retraction from Curtis, which was refused. The court then commented that the jury was warranted in concluding from all the facts in the case, including "the persistent and continuing attitude of the officers and agents of the defendant that there was a wanton or reckless indifference of plaintiff's rights." Supra note 6, 225 F. Supp. at 919.

27. Note, 6, supra, at 921.

28. 98 C.J.S. Witnesses § 399; 3 Wigmore, Evidence (3d ed 1940), § 1006(2).

29. See Roberson v. United States, (5 Cir. 1957) 249 F.2d 737; Carpenter v. United States, (4 Cir. 1959) 264 F.2d 565; Poliafico v. United States (6 Cir. 1956) 237 F.2d 97.

The ruling was based upon lapse of time.[30]

Curtis sought to introduce into evidence certain extrajudicial statements made by George Burnett, and statements made to him by third parties. These included inquiries made by Burnett of the telephone operator and her replies thereto;[31] a telephone conversation between Burnett and one Milton Flack, purportedly made immediately after Burnett had overheard a telephone conversation between Butts and Bryant;[32] Burnett's conversation with one Bob Edwards about the notes he had taken;[33] Burnett's statements at meetings with officials of the University of Georgia; and statements of these university officials made in checking Burnett's story at meetings with him.[34] All of these incidents had been reported in the article.

■ It was, of course, important from Curtis' standpoint that it show its good faith in publishing the article. The proffered evidence would have tended to show that these statements as set forth in the article had, in fact, been made, and we think the trial court should have admitted it for that limited purpose only. However, the full import of most, if not all, of that evidence got before the jury in some form before the trial was concluded.

■ In any event, none of the testimony involved related to the real "sting of the libel", and we do not consider that substantial error was committed in its exclusion. Curtis had the burden to show more than nominal error to secure reversal for rulings of evidence,[35] and this it has failed to do.

## THE JURY INSTRUCTIONS

■ Complaint is made that the trial court committed plain and prejudicial error in instructing the jury. No objections to any instructions were made at the trial of the case.[36]

Rule 51, F.R.Civ.P., provides in part that:

"No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury."

---

30. Supra note 6, 225 F.Supp. at 921.

31. Curtis says this was offered only to show that a telephone conversation between Butts and Bryant had actually taken place. Butts, however, contends no such limitation was placed on this testimony.

32. Burnett testified that he had been trying to contact Milton Flack by telephone when he intercepted the alleged call between Butts and Bryant, after which he says he hung up the phone and sat for about twenty or thirty seconds before picking up the phone and again calling Flack's number. Curtis wanted to prove that Burnett asked Flack: "Is Wally Butts in your office now Milt", to which Flack is supposed to have replied that Butts was at that time in his office making a telephone call. The court allowed Burnett to state that he called Flack, but excluded as hearsay anything he might have said to Flack.

33. Bob Edwards was division manager of the company with which Burnett was connected. Burnett testified that he had a conversation with Edwards on January 4, 1963 about the notes he had taken on September 13, 1962. The court sustained an objection to the conversation itself on the ground that it was hearsay. On cross-examination, Burnett testified that he did not have his notes with him when he first talked with Edwards on January 4, 1963, but did show them to Edwards some two weeks later.

34. Curtis contends that the investigation conducted by the officials of the University of Georgia would support Burnett's credibility, because it demonstated his willingness to cooperate, and to have his story questioned.

35. Rule 61, F.R.Civ.P.; Jennings v. United States (5 Cir. 1934), 73 F.2d 470, 471.

36. The claim that certain of the jury instructions violated constitutional rights of Curtis is dealt with in this opinion under the heading "Curtis' Constitutional Rights". See notes 15–23, supra.

Full opportunity was afforded counsel for Curtis to make any objections before the jury was permitted to consider its verdict. Under Rule 61, F.R.Civ.P., all errors which could not change the result of the trial, or which did not affect the substantial rights of the parties, are harmless and must be disregarded. No action taken by the court with respect to any instruction now under attack appears inconsistent with substantial justice, or to have affected the substantial rights of the parties, and we agree with the trial court that Curtis may not now complain.[37]

### THE REFUSAL TO GIVE REQUESTED INSTRUCTIONS

There is no merit to Curtis' contention that the trial court erred either in refusing to charge the jury that it should construe Butts' testimony most strongly against him, or in refusing to charge the jury that it should disregard the entire testimony of any witness whom it found to have knowingly and wilfully testified falsely.

The court's charge fully covered the general rules relating to the credibility of witnesses. The question concerning the credibility of any witness, and whether or not he had been successfully impeached, was left entirely to the jury. There was no showing that any witness had knowingly and wilfully testified falsely, and the evidence was more than adequate to support the verdict, even if the jury had completely disregarded the alleged equivocal testimony of Butts.

### THE "NEWLY DISCOVERED EVIDENCE"

In its motion for new trial under Rule 60(b) (2), F.R.Civ.P., Curtis

contended that new evidence discovered since the trial conclusively demonstrates the falsity of the testimony of two of Butts' witnesses, Dr. Frank A. Rose and Coach Paul "Bear" Bryant, and strongly supports the defense of justification.

The trial court rejected this contention because (1) Curtis had not exercised reasonable diligence, (2) the evidence would merely tend to affect the weight and credibility of the testimony of Dr. Rose, and (3) the evidence would not have changed the verdict in this case.[38]

We are in accord with the trial court's conclusions, and do not find that he has abused his discretion.

### PUNITIVE DAMAGES

The trial judge gave his reasons for requiring the remittitur of all punitive damages in excess of $400,000.[39] There is not the slightest suggestion that he thought, or even intimated, that the larger award was based on passion or prejudice. On the contrary, fully aware of the distinction between a verdict excessive in amount which may be reduced by remittitur, and one resulting from improper influences such as passion and prejudice which may not be corrected in this way, the judge necessarily rejected the idea that this verdict had been infected by such destructive elements.

The Georgia Code expressly provides for punitive damages.[40] Under Georgia law, three things are left for the jury to determine: (1) "when punitive damages shall be allowed"; (2) "the amount of such damages"; and (3) the purpose of the award as "either 'to deter the wrongdoer from repeating the trespass or as compensation for the wounded

---

37. Supra note 6, 225 F.Supp. at 922.

38. In his opinion dated April 7, 1964 the trial court fully discussed this matter. (See supra note 23, at 712).

39. Supra note 6, 225 F.Supp. at 919.

40. Ga.Code Ann. § 105–2002: "In every tort there may be aggravating circumstances, either in the act or the intention,

and in that event the jury may give additional damages, either to deter the wrongdoer from repeating the trespass or as compensation for the wounded feelings of the plaintiff." Also see National Association for the Advancement of Colored People v. Overstreet, 221 Ga. 16, 142 S.E. 2d 816. See Division 4, subd. (b) of opinion.

feelings of the plaintiff.' "[41] Obviously there are, and can be, no precise standards for these determinations. Not for the first time in the common law tradition, the law turns to the jury. And Georgia prescribes that "(t)he measure of * * * punitive damages * * * is to be fixed by the enlightened conscience of an impartial jury."[42] What the "enlightened conscience" of one impartial jury might consider to be fair may not satisfy another impartial jury with an equally enlightened conscience. A wide variance in the amounts of such awards is inescapably inherent in any submission of the issue of punitive damages.

█ But, of course, no one would suppose that it is left wholly and solely to the jury. As with every other issue traditionally for jury resolution, the trial judge must still determine whether, as a matter of law, the verdict comports with law. The law recognizes that an award of any type of damages—compensatory or punitive—made by a jury free of bias, may be too small or too large. When that

occurs—when the judge concludes that the law regards the verdict as too small or too large—then appropriate action must be taken by the court. Reviewing the amount of the verdict and reaching the conclusion that it is more than the law would permit is not, therefore, the equivalent of the judge's determination that excessiveness is due to a runaway jury, under the spell of passion or bias.

█ The trial judge had the duty of determining whether as a matter of law (a) any allowance for punitive damages could be made, and (b) what the maximum would be. As to (a), the trial court not only expressed the opinion that the article was extremely defamatory, and that the jury had no choice other than to find Curtis liable, but he also thought that there was "ample evidence from which a jury could have concluded that there was reckless disregard by defendant of whether the article was false or not."[43] Upon determining (b) he had then to decide whether to grant a new trial or require a remittitur as to the excess.[44] The latter is a permissible

41. National Association for the Advancement of Colored People v. Overstreet, supra, note 40.

42. Id.

43. The trial court said, in its April 7, 1964 opinion (See supra note 23, at 395), that:
"If it were conceded that plaintiff Butts was a 'public official', the case of New York Times Company v. Sullivan would not permit the vacating of this Court's previous judgment, as the ruling in the Times case does not prohibit a public official from recovering for a defamatory falsehood where he proves 'actual malice' —that is, with knowledge that it was false *or with reckless disregard of whether it was false or not.* (Italics supplied). In the trial of this case, there was ample evidence from which a jury could have concluded that there was reckless disregard by defendant of whether the article was false or not. See the court's ruling on defendant's motion for a new trial dated January 14, 1964. Butts v. Curtis Publishing Company, 225 F.Supp. 916."

44. State Farm Mutual Automobile Insurance Company v. Scott (5th Cir. 1952) 198 F.2d 152.
Curtis cites Crowell-Collier Publishing Company v. Caldwell (5th Cir. 1948), 170 F.2d 941, where this Court held that the refusal to set aside a libel verdict of $237,500 was an abuse of discretion. Judge Hutcheson found that "litigants, witnesses, lawyers and jury seemed to regard the contest as a sporting event, a wager by battle, in which the best battler ought to and would win;" that the trial judge "held himself a little too aloof from the trial * * *, with the result that the trial got out of hand;" and that "when counsel for defendant made vigorous objections to the argument as highly improper, inflammatory, and prejudicial, and requested the court to instruct the jury to disregard them, the court said merely: 'Objection overruled. Request denied. Exception noted.'" Obviously, the same circumstances were not present in the instant case, where the judge was in complete control, the trial was conducted in an orderly, efficient and proper manner, and no objections whatever were made to the conduct of the trial, or to the arguments of counsel.

course and does not infringe upon the Seventh Amendment's guaranty of a jury trial.[45] In making his determination as to (b), he pursued the correct standard of keeping the verdict "within reasonable bounds considering the purpose to be achieved as well as the corporate defendant's wanton or reckless indifference to the plaintiff's rights."[46] Obviously, in deciding the matter the judge had to pick a dollar figure beyond which the law would not go. He selected the sum of $400,000 as the maximum which the law would accept to deter Curtis from repeating the trespass or to compensate the wounded feelings of Butts.[47] Although the reduction required, and the sum remaining, were each substantial, there was ample basis for the trial court's judgment.

To have granted a new trial might appear to have been an easier way out. But that is really no solution. On a retrial, the judge could not instruct the next jury as to the dollar maximum of any such verdict. So that jury would be pretty much on its own, under the unavoidably vague, elastic standards prescribed in the Code, as measured by the enlightened conscience of an impartial jury.[48] The trial judge, on the second trial, would then be forced to repeat the process of testing for (a) and (b). If, as urged by Curtis, the determination by the judge that the amount is too much, necessarily means a new trial, it is quite possible that the case would never end. Georgia has prescribed the "punishment" for aggravated willful torts. The law ought not to frustrate the vindication of

that policy by an unrealistic procedure. The jury verdict, as reviewed and reduced by the trial judge, is the tort-feasor's assurance that such damages will not exceed that which the law would tolerate to achieve the Georgia objective of deterring repetition or compensating wounded feelings.

## CONCLUSION

This is no ordinary libel case. The publication of the article by the Post, in the face of several specific appeals that it refrain from doing so, was part and parcel of a general policy of callousness, which recognized from the start that Butts' career would be ruined. The trial judge's appraisal of the evidence, with which we are in complete accord, was that it was sufficiently strong to justify the jury in concluding that what the Post did was done with reckless disregard of whether the article was false or not.

The case was fully developed during extensive pre-trials, and in a jury trial lasting two weeks. The record itself comprises 1613 pages. We have given full consideration to the entire record, as well as to the more than 650 pages of briefs submitted by both parties, the numerous authorities cited therein, and the oral arguments of counsel. We think that Curtis has had its day in court. It apparently thought so too until the jury verdict was returned. This is attested by the fact that practically all of its present complaints were not even raised until after the trial.

Believing and so finding that the trial was fair, and that the judgment of the

45. Arkansas Valley Land & Cattle Co. v. Mann, 1889, 130 U.S. 69, 9 S.Ct. 458, 32 L.Ed. 854; International Paper Co. v. Busby, (5 Cir. 1950) 182 F.2d 790; United States v. Certain Parcels of Land in Rapides Parish, La., (5 Cir. 1945) 149 F.2d 81, 83.

46. Supra note 6, 225 F.Supp. at 920.

47. Supra note 6, at 919. Butts, in arguing that the district court was far more lenient to Curtis in reducing the award than was justified, said: "The jury in the case at bar recognized that a 100 million dollar corporation with a circulation of

between six and seven million copies and a readership of approximately 22,000,000 persons can be deterred by no less than three million dollars as a charge for its misuse of a cherished American freedom —the freedom of every man to live unthreatened by calumny. This jury believed that anything less than this amount would merely add to the audacious course of 'sophisticated muckraking' upon which the Curtis Publishing Company has admittedly set its sights" See also note 26, supra.

48. See notes 40 and 41, supra.

trial court was correct and proper in all respects, it is Affirmed.

In view of our holding, we have given no consideration to Butts' cross appeal.

RIVES, Circuit Judge (dissenting):

Wallace Butts, former Athletic Director of the University of Georgia, instituted this diversity action in the district court against the Curtis Publishing Company, publishers of The Saturday Evening Post. The complaint demanded $5,000,000 general and $5,000,000 punitive damages for an alleged libel contained in an article entitled, "The Story of a College Football Fix," which was published in the March 23, 1963, issue of the Post. The action resulted in a jury verdict against the defendant for $60,000 general damages and $3,000,000 punitive damages. The district court granted the defendant's motion for a new trial, conditioned upon the failure of the plaintiff to remit that portion of the award of punitive damages in excess of $400,000. The district court was of the opinion that the award of $60,000 for actual damages was not excessive, but the court concluded that the award for punitive damages was "grossly excessive." Pursuant to the district court's order, the plaintiff filed a remittitur and thereafter the district court overruled the defendant's motion for a new trial and entered judgment for the plaintiff in the amount of $460,000. Approximately six weeks after the district court entered judgment, the Supreme Court decided New York Times Co. v. Sullivan,[1] and the defendant filed its motion for new trial under Rule 60(b) of the Federal Rules of Civil Procedure. The defendant contended that the previous judgment should be vacated and a new trial ordered in light of the New York Times Co. case. The district court denied the motion.

It is my view that the district court erred in not granting a new trial in light of New York Times Co. If mistaken in that view, I am nonetheless convinced that the part of the judgment awarding $400,000 in punitive damages cannot stand in the light of the first, fifth and seventh amendments to the Constitution.

First, however, let me say that this record makes clear beyond controversy that the questions of fact are for the jury's determination. The district court denied the plaintiff's motion for a directed verdict. Plaintiff's counsel insisted and the following colloquy ensued:

"MR. LOCKERMAN:

"—on the point that the defendant had not, under the evidence that it has shown, proven the truth under the burden that it had of the things that it has said against the plaintiff in this article.

"THE COURT:

"Mr. Lockerman, I think it would [be] in error for this Court to withdraw that issue from the Jury."

In ruling on the motion for new trial, however, the district court commented: "The guilt of the defendant was so clearly established by the evidence in the case so as to have left the jury no choice but to find the defendant liable." The majority opinion quotes that comment and adds its "Amen" thus: "We wholeheartedly agree with that appraisal." I do not think that any such appraisal should be made. Even a casual reading of the record demonstrates that the questions of fact should be left to the jury.

I. Sullivan v. New York Times Co. necessitates reversal of the judgment in toto.

The Supreme Court in New York Times Co. v. Sullivan held that the Constitution limits state power, in a civil action brought by a public official for criticism of his official conduct, to an award of damages for a false statement made with "actual malice," that is with knowledge that it was false or with reckless disregard of whether it was false or

1. 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). See, generally, Berney, Libel and the First Amendment—A New Constitutional Privilege, 51 Va.L.Rev. 1 (1965).

not.[2] The district court did not think the New York Times Co. case governed the present action for the reason that the present plaintiff was not a "public official" as contemplated by the New York Times rule, and for the reason that ample evidence existed from which a jury could have concluded that there was reckless disregard by the defendant of whether the article was false or not. [R., p. 1467–68.] The district court stated that "[t]o hold plaintiff, an employee of the University Athletic Association, a public official would, in this Court's opinion, be extending the 'public official' designation beyond that contemplated by the ruling in the case of New York Times Company v. Sullivan * * *." [R., p. 1467.] The plaintiff held to be a "public official" in New York Times Co. was Commissioner of Public Affairs, one of three elected Commissioners of the City of Montgomery, Alabama. His duties involved the supervision of the Police Department, Fire Department, Department of Cemetery and Department of Scales.[3] The Supreme Court noted:

"We have no occasion here to determine how far down into the lower ranks of government employees the 'public official' designation would extend for purposes of this rule, or otherwise to specify categories of persons who would or would not be included. Cf. Barr v. Matteo, 360 U.S. 564, 573–575, 79 S.Ct. 1335, 1340–1341, 3 L.Ed.2d 1434. Nor need we here determine the boundaries of the 'official conduct' concept. It is enough for the present case that respondent's position as an elected city commissioner clearly made him a public official, and that the allegations in the advertisement concerned

what was allegedly his official conduct as Commissioner in charge of the Police Department.[4]

It is clear that "public officials" as contemplated by New York Times Co. are not limited to elected officials. In Garrison v. Louisiana,[5] decided subsequent to New York Times Co., the District Attorney for Orleans Parish, Louisiana, was convicted of criminal libel for issuing a statement disparaging the judicial conduct of the eight judges of the Criminal District Court. The Supreme Court's decision, which brought the District Attorney's statement within the purview of criticism of the official conduct of "public officials" and entitled to the benefit of the New York Times Co. rule, did not hinge on whether the eight judges were elected officials. No mention was made of how the judges obtained their positions. Moreover, it is clear from the Court's statement in New York Times Co., quoted above, that the rule applies to "government *employees*." The question reserved by the Court was "*how far down* into the lower ranks of government employees the 'public official' designation would extend * * *."[6] A precise formula for designation of "public officials" for the purpose of the New York Times rule was not attempted. Indeed, it is clear from the background and reasons for the rule that to fashion and apply a precise formula for designation of "public officials" for the purpose of the New York Times rule would be a formidable, if not impossible, task.[7]

The first amendment secures freedom of expression upon public questions. The constitutional safeguard, the Supreme Court has said, "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social

2. 376 U.S. 254, 279–280, 84 S.Ct. 710 (1964); Garrison v. Louisiana, 379 U.S. 64, 67, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964).

3. See New York Times Co. v. Sullivan, 1964, 376 U.S. 254, 256, 84 S.Ct. 710.

4. Id. at 283, n. 23, 84 S.Ct. at 727.

5. 379 U.S. 64, 85 S.Ct. 209 (1964).

6. New York Times Co. v. Sullivan, 376 U.S. 254, 283, n. 23, 84 S.Ct. 710, 727 (emphasis supplied).

7. Cf. Burton v. Wilmington Parking Authority, 1961, 365 U.S. 715, 722, 81 S.Ct. 856, 6 L.Ed.2d 45 (state responsibility under the Equal Protection Clause.).

changes desired by the people." [8] Similarly, "[I]t is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions." [9] Mr. Justice Brandeis has stated that "[t]hose who won our independence believed * * * that public discussion is a political duty; and that this should be a fundamental principle of the American government." [10] New York Times Co. v. Sullivan, 1964, 376 U.S. 254, 269–270, 84 S.Ct. 710. As was said in Garrison v. Louisiana,[11] the First and Fourteenth Amendments embody our 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.' New York Times Co. v. Sullivan * * *." It was against this background that the Supreme Court in New York Times Co. stated that the newspaper advertisement, which contained an inaccurate description of events occurring in Montgomery in connection with the civil rights movement, was an expression of grievance and protest on one of the major public issues of our time and would seem clearly to qualify for the constitutional protection.[12]

It is therefore necessary to examine the facts and weigh the circumstances to determine whether the allegedly defamed plaintiff is involved in the "conduct of the public business" [13] to an extent which attains constitutional significance.

The plaintiff held his position of Athletic Director of The University of Georgia by reason of a contract with the Board of Regents of the University System of Georgia, which hired him as an employee. [Brief for Appellee, p. 67.] The plaintiff supervised the scheduling and location of games, planned the budget, attended to the addition of new athletic facilities, supervised ticket sales and prepared plans for band trips and performances. Moreover, he generally supervised "the entire athletic program of the school." [R., pp. 654–55; Brief for Appellee, pp. 69–70.] The education of youth in the State of Georgia is unquestionably a matter of public concern. By his position the plaintiff is intricately involved with a significant public issue, that is, the education of the youth who attend The University of Georgia—a public institution. According to the Duke of Wellington, "The battle of Waterloo was won on the playing fields of Eton." The ever-increasing difficulties to be faced by this nation require the utmost integrity in the training of its youth. I think the plaintiff is a "public official" as contemplated by the New York Times Co. decision.

The article, which the defendant published under the subtitle, "How Wally Butts and Bear Bryant Rigged a Game Last Fall," concerned alleged information on Georgia plays given by Wallace Butts to Coach Paul Bryant relating to the University of Alabama and the University of Georgia football game played in Birmingham in September 1962. The article charged Wallace Butts with being corrupt and with betraying his players. It charged that the players were forced into the game like "rats in a maze" and "took a frightful physical beating." In an italicized preface to the article, "The Editors" stated that Wallace Butts and Coach Bryant were participants in the greatest and most shocking sports scandal since that of the Chicago White Sox in the 1919 World Series. In the same preface, Wallace Butts was relegated to a

---

8. Roth v. United States, 1957, 354 U.S. 476, 484, 77 S.Ct. 1304, 1 L.Ed.2d 1498.

9. Bridges v. State of California, 1941, 314 U.S. 252, 270, 62 S.Ct. 190, 86 L.Ed. 192.

10. Whitney v. California, 274 U.S. 357, 375–376, 47 S.Ct. 641, 648, 71 L.Ed. 1095 (1927) (concurring opinion).

11. 379 U.S. 64, 75, 85 S.Ct. 209, (1964).

12. See 376 U.S. at 271, 84 S.Ct. 710.

13. Garrison v. Louisiana, 1964, 379 U.S. 64, 73, 85 S.Ct. 209, 216.

status worse than that of "disreputable gamblers" and a corrupt person who, employed to "educate and guide young men," betrays or sells out his pupils. [See R., pp. 88–89 (order granting motion for new trial.)]

I think it clear that the defendant's statements are within the purview of criticism of the official conduct of public officials. As stated by the Supreme Court, "[t]he public official rule protects the paramount public interest in a free flow of information to the people concerning public officials, their servants. To this end, anything which might touch on an official's fitness for office is relevant. Few personal attributes are more germane to fitness for office than dishonesty, malfeasance, or improper motivation, even though these characteristics may also affect the official's private character.[14]

The district court charged the jury that general damages were recoverable absent proof of actual malice. The plaintiff argues that even if the New York Times rule is applicable, the district court's failure to charge that malice is a prerequisite for actual damages is harmless error since the district court charged that actual malice was required for an award of punitive damages and the jury awarded punitive damages. I do not agree that the district court's charge complies with the New York Times rule.

In dealing with the question of punitive damages, the district court charged the jury:

"Where it is established that the defendant was inspired by actual malice in the publication of the defamatory matter, the jury, in its discretion, may, but is not required, to award punitive damages. As previously stated to you, actual malice encompasses the notion of ill will, spite, hatred and an *intent to injure one.* Malice also denotes a wanton or reckless indifference *or culpable negligence with regard to the rights of others.*" [R., pp. 1356] (Emphasis supplied.)

I think it clear that the district court's charge does not embrace the New York Times Co. definition of actual malice, which is with knowledge that *the statement* was false or with reckless disregard of whether it was false or not. The New York Times rule emphasizes "the knowingly false *statement* and the false *statement* made with reckless disregard of the truth," [15] and not merely intent to injure the individual or negligent disregard of the rights of others. The necessary requisite to a showing of actual malice under the New York Times standard is proof that "the lie * * * [is] knowingly and deliberately published about a public official" or published "with reckless disregard of the truth." [16]

Since the jury might well have understood the district court's charge to allow recovery on a showing of intent to inflict harm or even the culpably negligent infliction of harm, rather than intent to inflict harm through falsehood, the charge does not comply with the New York Times standard.[17]

The majority of this Court have held that the defendant "has clearly waived any right it may have had to challenge the verdict and judgment on any of the constitutional grounds asserted in Times." While I respect the judgment of the majority, I do not share that judgment.[18] In short, I do not think the

14. Garrison v. Louisiana, 1964, 379 U.S. 64, 76–77, 85 S.Ct. 209.

15. Id. at 75, 85 S.Ct. at 216 (emphasis supplied).

16. Ibid.

17. Henry v. Collins, 1965, 380 U.S. 356, 85 S.Ct. 992, 13 L.Ed.2d 892; see Garrison v. Louisiana, 1964, 379 U.S. 64, 73, 85 S.Ct. 209.

18. It seems to me that to constitute such a waiver there must have been "an intentional relinquishment or abandonment of a known right or privilege." Johnson v. Zerbst, 1938, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461; Fay v. Noia, 1963, 372 U.S. 391, 439, 83 S.Ct. 822, 9 L.Ed.2d 837.

defendant may be said to have waived by "silence" a constitutional right not enunciated at the time; it was not even enunciated by the counsel who petitioned for certiorari in the New York Times Co. decision.

In the New York Times Co. case, the trial judge charged that the portions of the advertisement in issue were "libelous *per se*," that "general damages need not be alleged or proved but are presumed," that the plaintiff was entitled to recover both such "presumed" and punitive damages if the jury decided that the words related to and concerned him and that the damages awarded were not excessive. The jury awarded damages of $500,000. The questions presented to the Supreme Court in the petition for a writ of certiorari dealt with the *award* of $500,000, the *sufficiency of the evidence* and the lack of proof of *special damages* in light of the first amendment as embodied in the fourteenth.[19] Conspicuously absent is any suggestion that the first amendment, as embodied in the fourteenth amendment, requires that a public official must prove *actual malice* against critics of his official conduct.[20] Apparently this is due to the

fact that the defendant's objections in the trial court were directed to the absence of a requirement of proof of special damages.[21] Only by looking at the New York Times Co. case in retrospect can it be said that the defendant has waived the great constitutional rights contemplated by the New York Times rule. But applying the same "retrospective look" to the present case,[22] it is also clear that had the defendant contended the same as did the defendant in the New York Times case, i. e., that the first and fourteenth amendments were "infringed by holding the publication libelous and actionable without proof of special damage,"[23] it would not have affected the trial of the present action; for the district court ruled, in dealing with the motion for new trial, that the New York Times rule was not applicable to the present plaintiff. [R., p. 1467.]

The fact that the present defendant offered no defense under Georgia law, which provides that communications concerning the "acts of public men in their public capacity" are deemed privileged under certain conditions, cannot be said to constitute a waiver of a defense that

---

**19.** In detail, the questions presented were:
"1. Whether, consistently with the guarantee of freedom of the press in the First Amendment as embodied in the Fourteenth, a state may hold libelous *per se* and actionable by an elected City Commissioner, without proof of special damage, statements critical of the conduct of a department of the City Government under his jurisdiction which are inaccurate in some particulars.
"2. Whether there was sufficient evidence to justify, consistently with the guarantee of freedom of the press, the determination that statements, naming no individual but critical of the Police Department under the jurisdiction of the respondent as an elected City Commissioner, were defamatory as to him and punishable as libelous *per se*.
"3. Whether an award of $500,000 as 'presumed' and punitive damages for libel constituted, in the circumstances of this case, an abridgement of the freedom of the press."
Petition for Writ of Certiorari, p. 2, New York Times Co. v. Sullivan, 1964, 376 U.S. 254, [84 S.Ct. 710].

**20.** In three of the 105 pages of their petition for certiorari, counsel dealt with "the doctrine espoused by the court below * * * that a public official is entitled to recover 'presumed' and punitive damages for a publication critical of the official conduct of a governmental agency under his general supervision, if that publication tends to 'injure' him 'in his reputation' or to 'bring' him 'into public contempt' as an official—unless a jury is persuaded that it is entirely true." Except for the statement of the case and facts, malice was mentioned in one sentence. See Petition for a Writ of Certiorari to the Supreme Court of Alabama, p. 13, New York Times Co. v. Sullivan.

**21.** See Petition for a Writ of Certiorari to the Supreme Court of Alabama, p. 8, New York Times Co. v. Sullivan.

**22.** In football jargon, "by being Monday morning quarterbacks."

**23.** Ibid.

the plaintiff is a "public official" under the New York Times standard. As recognized by the plaintiff, members of the athletic department are, like members of the faculty, "employees" under Georgia law and are not considered in "public office" or "officers." [24] Thus, although the Georgia statute which grants a privilege to "[c]omments upon the acts of public men in their public capacity and with reference thereto" [25] appears as broad, if not broader, than the "public official" as contemplated by New York Times Co., the plaintiff recognizes that the Georgia case law results in a narrow application of the privilege and the present plaintiff is not covered.

Moreover, I think that Henry v. Collins,[26] reflects that the Supreme Court does not intend to allow the great constitutional rights inherent in the New York Times rule to be ignored in a case such as the present one.

In Henry v. Collins, the most recent Supreme Court decision interpreting the New York Times rule, the Court reversed per curiam the judgments obtained by a county attorney and a chief of police in their libel actions against the petitioner. The petitioner had charged that his arrest for disturbing the peace was the result of "a diabolical plot." The trial judge had charged "that malice does not necessarily mean hatred or ill will, but that malice may consist merely of culpable recklessness or a wilful and wanton disregard of the rights and interests of the person defamed." The Supreme Court reversed since the trial judge's instructions concerning malice did not comply with the New York Times rule. The trial of the plaintiff's suit and the decision of the Mississippi Supreme

Court affirming the judgments occurred shortly before the Supreme Court handed down New York Times Co. Like the present defendant, the defendant in Henry raised his first amendment question by a motion for a new trial. However, the defendant in Henry filed a motion for a directed verdict at the same time which also raised the first amendment question. Both motions were overruled. Significant is the fact that the constitutional questions raised by the motions were raised for the first time after the close of the plaintiffs' case.[27]

Since the majority of this Court are not of the opinion that the judgment must be reversed, considerations of effective judicial administration do not require me to review the evidence in the present record to determine whether it could constitutionally support a judgment for the plaintiff should the plaintiff seek a new trial.[28]

In summary, I think the present diversity action was brought by a public official for criticism of his official conduct; therefore, he was limited to an award of damages for a false statement made with "actual malice"—that is, with knowledge that it was false or with reckless disregard of whether it was false or not. The present action was tried on a definitely stated theory which was fundamentally and constitutionally deficient. The present action should be tried on the theory set forth by the Supreme Court's decision supervening the district court's judgment, that is, New York Times Co. v. Sullivan. In such a situation, it has been held, as far back as 1937, that the duty of the district court is to grant the motion for a new trial.[29]

24. Brief for Appellee, pp. 67–69.

25. Ga.Code Ann., § 105–709(6).

26. 1965, 380 U.S. 356, 85 S.Ct. 992, 13 L.Ed.2d 892.

27. See Petition for Writ of Certiorari to the Supreme Court of Mississippi, Henry v. Pearson, p. 6. Henry v. Pearson and Henry v. Collins were decided together. See Henry v. Collins, 1965, 380 U.S. 356, 85 S.Ct. 992.

28. New York Times Co. v. Sullivan, 1964, 376 U.S. 254, 284–285, 84 S.Ct. 710.

29. Sulzbacher v. Continental Cas. Co., 8 Cir. 1937, 88 F.2d 122.
It should be noted that the learned district judge in the present case did not deny the defendant's motion for a new trial on the basis that the defendant had "waived" the constitutional rights defined in New York Times Co., but, instead, con-

II. That part of the Judgment awarding $400,000 punitive damages violates the defendant's rights under the first, fifth and seventh amendments.

On the question so far discussed, that is, whether New York Times v. Sullivan necessitates reversal of the judgment in toto, I would concede that there is a debatable issue of waiver on which I differ from the majority. The questions hereafter discussed had their genesis in the jury's verdict and are unquestionably preserved for review by the defendant's first motion for new trial (R., pp. 46–48). As to the questions now to be considered, there can be no issue of waiver.

The punitive damages, either as found by the jury or as fixed by the court, are many times greater in amount than the general damages. Under the court's instructions to the jury, the general damages included compensation "for the mental anguish, pain, mortification, and humiliation he has experienced as a result of the publication." (R. 1354) The punitive damages included no element to which the plaintiff was entitled by way of compensation, but, according to the court's instruction to the jury, "the purpose of punitive damages is to deter the defendant from a repetition of the offense and is a warning to others not to commit a like offense. It is intended to protect the community and has an expression of ethical indignation, although the plaintiff receives the award." (R. 1356) The statute which allows the jury to impose punitive damages is Georgia Code Annotated § 105–2002, which reads:

"In every tort there may be aggravating circumstances, either in the act or the intention, and in that event the jury may give additional damages, either to deter the wrongdoer from repeating the trespass or as compensation for the wounded feelings of the plaintiff."

In the present case "compensation for the wounded feelings of the plaintiff" had been included in the general damages. [See R., p. 1354, quoted supra.] The trial court expanded considerably on the alternative purpose "to deter the wrongdoer from repeating the trespass"; it included also "a warning to others not to commit a like offense," the protection of "the community," and "an expression of ethical indignation." [See R., p. 1356, quoted, supra.] The jury was bound to observe the instructions of the court. For the purpose of considering whether the jury's award of punitive damages exceeded constitutional bounds, it is of no moment that it may also have exceeded the limits set by the statute.[30] The court further instructed the jury that, " * * * if you decide to award punitive damages, the sum you award need have no relationship to any amount that you may award for general damages. It may be greater or it may be less. That is a matter which rests in your sole discretion." [R., p. 1356.] The jury could reasonably infer that no limit was placed on the exercise of its discretion.

If the defendant corporation had been tried under the Georgia criminal libel statute,[31] it might have been punished by a fine "not to exceed $1,000."[32] As it is, the defendant stands subjected to a judgment of $400,000 for punitive damages, four hundred times the maximum fine for criminal libel. Evidently, the $400,000 sufficed to express the trial judge's sense of "ethical indignation" while that of the jurors swelled to $3,-000,000—3,000 times the maximum fine which could have been imposed in a criminal prosecution.

---

sidered the motion for new trial on its merits. [R. pp. 1464–68.]

30. According to the brief of the appellee, plaintiff (p. 86): "It is apparent that the purpose of this Code section in cases of defamation is to deter the defendant from republishing this one particular libel at a later date. It does *not* prevent the defendant from publishing any *other* matter, whether thought libelous of the plaintiff or not." (Emphasis the appellee's.)

31. Ga.Code Ann. § 26–2101.

32. Ga.Code Ann. § 26–2101, 27–2506.

Further, in a criminal proceeding, the defendant was subject to *no* fine unless proved guilty beyond a reasonable doubt, while here the judge charged the jury that " * * * the defendant, Curtis Publishing Company, has the burden of proving by a preponderance of the evidence that the statements contained in this article are true * * *." (R., p. 1347.)

I would not imply that the return of punitive damages in the ordinary case is constitutionally suspect, for more than a century ago the Supreme Court commented:

"It is a well-established principle of the common law, that in actions of trespass and all actions on the case for torts, a jury may inflict what are called exemplary, punitive, or vindictive damages upon a defendant, having in view the enormity of his offence rather than the measure of compensation to the plaintiff. We are aware that the propriety of this doctrine has been questioned by some writers; but if repeated judicial decisions for more than a century are to be received as the best exposition of what the law is, the question will not admit of argument. By the common as well as by statute law, men are often punished for aggravated misconduct or lawless acts, by means of a civil action, and the damages, inflicted by way of penalty or punishment, given to the party injured."

Day v. Woodworth, 1851, 54 U.S. (13 How.) 363, 370–371, 14 L.Ed. 181.

The theory of punitive damages involves a blending of the interests of society in general with those of the aggrieved individual in particular.[33] There can be no serious question but that the Georgia statute permitting "additional damages"[34] is constitutional upon its face.

However, as that statute was applied by (1) the court's instructions to the jury, (2) the jury's verdict, and (3) the reduced judgment ultimately entered by the court on motion for new trial, the award of punitive damages in the present case is tantamount to a criminal fine or penalty. As said in the very recent case of United States v. Brown, U.S. Oct. Term, 1964, 85 S.Ct. 1707, decided June 7, 1965:

"It would be archaic to limit the definition of 'punishment' to 'retribution.' Punishment serves several purposes: retributive, rehabilitative, deterrent—and preventive. One of the reasons society imprisons those convicted of crimes is to keep them from inflicting future harm, but that does not make imprisonment any the less punishment."

Similarly, in Trop v. Dulles, 1958, 356 U.S. 86, 96, 78 S.Ct. 590, 595, 2 L.Ed.2d 630, it was said:

"In deciding whether or not a law is penal, this Court has generally based its determination upon the purpose of the statute.[18] If the statute im-

"18. Of course, the severity of the disability imposed as well as all the circumstances surrounding the legislative enactment is relevant to this decision. See, generally, Wormuth, Legislative Disqualifications as Bills of Attainder, 4 Vand. L.Rev. 603, 608–610; 64 Yale L.J. 714, 722–724.

poses a disability for the purposes of punishment—that is, to reprimand the wrongdoer, to deter others, etc., it has been considered penal.[19]

"19. E. g., United States v. Lovett, supra [328 U.S. 303, 66 S.Ct. 1073, 90 L.Ed. 1252]; Pierce v. Carskadon, 16 Wall. 234, 21 L.Ed. 276; Ex parte Garland, 4 Wall. 333, 18 L.Ed. 366; Cummings v. State of Missouri, 4 Wall. 277, 18 L.Ed. 356.

But a statute has been considered nonpenal if it imposes a disability,

33. Bryson v. Bramlett, 1958, 204 Tenn. 347, 321 S.W.2d 555, 557; Margaret Ann Super Markets v. Dent, Fla.1953, 64 So. 2d 291–292; Pratt v. Duck, 1945, 28 Tenn.App. 502, 191 S.W.2d 562, 564–565; Foster v. Bourgeois, Tex.Civ.App.1923, 253 S.W. 880, 885, aff'd 113 Tex. 489, 259 S.W. 917; 15 Am.Jur. Damages, § 266; 25 C.J.S. Damages § 117.

34. Ga.Code Ann. § 105–2002, quoted supra, p. 726.

not to punish, but to accomplish some other legitimate governmental purpose.[20]

"20. E.g., Mahler v. Eby, 264 U.S. 32, 44 S.Ct. 283, 68 L.Ed. 549; Hawker v. People of State of New York, 170 U.S. 189, 18 S.Ct. 573, 42 L.Ed. 1002; Davis v. Beason, 133 U.S. 333, 10 S.Ct. 299, 33 L. Ed. 637; Murphy v. Ramsey, 114 U.S. 15, 5 S.Ct. 747, 29 L.Ed. 47."

Footnote 18 to the text just quoted makes clear that the enormity of the verdict and even of the final judgment are relevant factors to be considered in determining whether the punitive damages amount to a criminal fine. I submit that there is no difference in substance between the punitive damages imposed in the present case and criminal punishment—an ex post facto punishment 400 times as great as the defendant could have anticipated from the criminal libel statute,[35] and imposed without any of the procedural safeguards which are required in criminal proceedings by due process.[36]

If there should be any doubt that the award of $400,000 in damages strictly punitive violates the due process clause for lack of the safeguards required in criminal proceedings, there can be none, I submit, that it amounts to a prior restraint upon freedom of the press. The rule as announced in New York Times Co. v. Sullivan, 1964, 376 U.S. 254, 277–278, 84 S.Ct. 710, has clear application to the facts of this case:

"What a State may not constitutionally bring about by means of a criminal statute is likewise beyond the reach of its civil law of libel. The fear of damage awards under a rule such as that invoked by the Alabama courts here may be markedly more inhibiting than the fear of prosecution under a criminal statute. See City of Chicago v. Tribune Co., 307 Ill. 595, 607, 139 N.E. 86, 90, 28 A.L.R. 1368 (1923). Alabama,

for example, has a criminal libel law which subjects to prosecution 'any person who speaks, writes, or prints of and concerning another any accusation falsely and maliciously importing the commission by such person of a felony, or any other indictable offense involving moral turpitude,' and which allows as punishment upon conviction a fine not exceeding $500 and a prison sentence of six months. Alabama Code, Tit. 14, § 350. Presumably a person charged with violation of this statute enjoys ordinary criminal-law safeguards such as the requirements of an indictment and of proof beyond a reasonable doubt. These safeguards are not available to the defendant in a civil action. The judgment awarded in this case—without the need for any proof of actual pecuniary loss— was one thousand times greater than the maximum fine provided by the Alabama criminal statute, and one hundred times greater than that provided by the Sedition Act. And since there is no double-jeopardy limitation applicable to civil lawsuits, this is not the only judgment that may be awarded against petitioners for the same publication. Whether or not a newspaper can survive a succession of such judgments, the pall of fear and timidity imposed upon those who would give voice to public criticism is an atmosphere in which the First Amendment freedoms cannot survive. Plainly the Alabama law of civil libel is 'a form of regulation that creates hazards to protected freedoms markedly greater than those that attend reliance upon the criminal law.' Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584." [37]

For yet another reason the award of $3,000,000 by the jury, or of $400,000 by

35. Ga.Code Ann. § 26–2101; compare art. 1, sec. 9, clause 3 of the Constitution.

36. See amendment 5 to the Constitution.

37. See also Cantwell v. State of Connecticut, 1940, 310 U.S. 296, 306, 60 S.Ct. 900, 84 L.Ed. 1213; Near v. State of Minnesota, 1931, 283 U.S. 697, 713–714, 720–723, 51 S.Ct. 625, 75 L.Ed. 1357.

the court, as punitive damages is unconstitutional and void. There was no semblance of definite standard or controlling guide to govern the award.[38] Can any standard be more vague or arbitrary than "an expression of ethical indignation" first on the part of the jury and then on the part of the trial judge? It must be remembered that stricter standards of permissible vagueness are applicable to a rule having a potentially inhibiting effect on freedom of the press than are applicable to rules relating to less important subjects.[39]

Still further, I submit that the remittitur violates the defendant's rights under the seventh amendment. The trial judge concluded "that the award for punitive damages in this case was grossly excessive. It is the court's considered opinion that the maximum sum for punitive damages that should have been awarded against Curtis Publishing Company should be $400,000.00." [R., p. 95] In another part of his opinion on motion for new trial, the district judge commented: "The award for punitive damages in the case under consideration is more than seventeen times larger than the highest award for punitive damages ever sustained." [R., p. 93.] The district judge's opinion is silent as to the underlying reason for such a grossly excessive verdict. The majority opinion says that " * * * the judge necessarily rejected the idea that this verdict had been infected by such destructive elements [as passion or prejudice]." [Majority opinion, p. 717.] With deference, I submit that that conclusion is not based on the record or on anything said by the trial judge. To the contrary, in colloquy with counsel, the judge may well have disclosed his view as to why the judgment was excessive: "Suppose the court should determine that probably a certain portion of the argument was improper, and therefore the verdict was excessive, and grant you a new trial

on that ground, and then it was tried again * * *." [R., p. 1373.]

The majority of this Court labors under a different impression. It several times refers to the defendant's new policy of "sophisticated muckraking" without benefit of what the defendant claimed that it meant by that expression [R., pp. 37–38, 1019.]:

"Defendant admits that beginning in the latter part of 1962, The Saturday Evening Post adopted an editorial policy of 'sophisticated muckraking' in the sense of printing the truth about the grave dangers facing the country, including the threat from outside the country and the deterioration of moral values within the country." [R., pp. 37–38.]

It was, of course, for the jury to say whether the defendant's explanation was true. In any event, I agree with the majority that the expression "was by itself more than enough to inflame the jury." [Opinion, p. 714.] If, as is impliedly conceded, the jury was "inflamed," then was not passion and prejudice the most probable cause for its grossly excessive verdict? The majority continues, "Counsel for Butts could only gild the lily." [Opinion, p. 715.] I am tempted to facetiously comment on their plentiful supply of "gilt," but, in a more serious vein, I must express my shock and surprise that this Court will leave standing what amounts to severe criminal punishment of the defendant in the face of the highly improper and prejudicial argument of plaintiff's counsel.

The majority says that "some of the argument was invited * * *," but is not more specific as to the particular argument of defendant's counsel which amounted to an invitation. However, the appellee's brief (p. 93) refers to the following:

"Mr. Cody's exact words were: (R. 1267)

38. Staub v. City of Baxley, 1958, 355 U.S. 313, 322, 78 S.Ct. 277, 2 L.Ed.2d 302.

39. Smith v. People of State of California, 1959, 361 U.S. 147, 151, 80 S.Ct. 215, 4 L.Ed.2d 205; Crump v. Board of Public Instruction, 1961, 368 U.S. 278, 287, 82 S.Ct. 275, 7 L.Ed.2d 285.

" 'The point I want to make is that a man [plaintiff] that will go to one of your public officials [Comptroller General], *bet* enough to start into this business and a lot of other businesses while he is charged with the duty of Athletic Director, but it is worse, in order to obtain the license to do that, to misrepresent your financial condition.' (Emphasis added)."

In response, there is attached to appellant's reply brief as Exhibits A and B, the affidavit of Mr. Cody supported by the affidavit of Rufus L. Hixon, the official court reporter. The court reporter's affidavit is to the effect that "after deponent had examined his stenotype notes, he telephoned Mr. Bondurant to state that the word 'bad' had been used by Mr. Cody in his closing argument but that the word 'bet' had been erroneously transcribed." [Exhibit B, p. 8a, Appellant's Reply Brief.]

In addition I would note that in beginning his argument, counsel for the defendant referred to his attachment to the University of Georgia and to the fact that the trial judge, opposing counsel, and he had received their training in that institution. The arguments of counsel are set forth in the record (pp. 1257–1341). They do not, in my opinion, disclose any invitation or provocation to justify or excuse the improper and inflammatory argument of plaintiff's counsel. The following excerpts are only samples of the objectionable parts of that argument, but, I submit, that they speak so loudly as not to require comment:

"Since he talked to you about the University of Georgia and when he was there, I think I likewise have a right to mention to you briefly that I probably have known Wally Butts longer than any man in this case. I was at Mercer University with Wally Butts when he played end on the football team there. He was in some respects a small man in stature, but he had more determination and more power to win than any man that I have ever seen in my life. I would not stand before you in this case today arguing in his behalf if I thought that Wally Butts would not tell you the truth when he raises his hand on this stand and swears to Almighty God that what he is going to tell you is the truth. [R., p. 1289]

\* \* \* \* \* \*

"Somebody has got to stop them. There is no law against it, and the only way that type of, as I call it, yellow journalism can be stopped is to let the Saturday Evening Post know that it is not going to get away with it today, tomorrow, or any more hereafter, and the only way that lesson can be brought home to them, Gentlemen, is to hit them where it hurts them, and the only thing they know is money. They write about human beings; they kill him, his wife, his three lovely daughters. What do they care? They have got money; getting money for it.

\* \* \* \* \* \*

"I am looking to you for my protection. Heavens (sic) knows, if you let them out of this case for five million dollars or less, and boy, it's been worth it to them, I may be next, because they are not going to stop with that. You may be next; my wife; my children; yourself. We have got to stop them now, and you are the only twelve in the world that can stop them. [R., p. 1319.]

\* \* \* \* \* \*

"I say, Gentlemen, this is the time we have got to get them. A hundred million dollars in advertising, would ten percent of that be fair to Wallace Butts for what they have done to him? Would a fifty cent assessment on each of the twenty-three million issues which they wrote about him there, would that be a strain or a burden on them? I think it would teach them that we don't have that kind of journalism down here, and we don't want it down here, and we don't want it to spread from 666

Fifth Avenue any further than that building right now.

\* \* \* \* \* \*

"My time is up, I have done the best I can. I have lived in agony with this man since I got the first notice that this was what was going to happen, this Post article was coming out. I have seen him deteriorating even since it came out, and I have lived in agony along with him, and it may be that the personal firsthand knowledge that I have had since almost living with him and his family every day, I may have said some things or done some things or conducted myself in some manner that was displeasing to you. All I can say, I have done my best, and if I have done any of those things, don't hold it against Wallace Butts.

"You know, one of these days, like everyone else must come to, Wallace Butts is going to pass on. No one can bother him then. The Saturday Evening Post can't get at him then. And unless I miss my guess, they will put Wallace Butts in a red coffin with a black lid, and he will have a football in his hands, and his epitaph will read something like this: 'Glory, Glory to old Georgia.'" [R., pp. 1321–22.]

If this dissent serves no other purpose, it will at least preserve for posterity the colorful peroration last quoted. Seriously, it seems to me that "[t]he public interest requires that the court of its own motion, as is its power and

duty, protect suitors in their right to a verdict, uninfluenced by the appeals of counsel to passion or prejudice." New York Central R. R. Co. v. Johnson, 1929, 279 U.S. 310, 318, 49 S.Ct. 300, 303, 73 L.Ed. 706. That would be true even if the prejudicial argument had not been followed by a grossly excessive verdict. I submit that the $3,000,000 punitive damage verdict was so clearly the result of passion and prejudice that it could not be cured by remittitur.[40]

It is difficult in any case to reconcile the practice of remittitur with the constitutional right of a defendant to trial by jury.[41] The logic of Professor Carlin's article on Remittiturs and Additurs (1942), 49 W.Va. LQ 1, 17, 18, quoted in 6 Moore F.P. (2d ed.) 3738–39, seems to me unanswerable.[42]

That logic is peculiarly applicable to the circumstances of this case, where only punitive damages are reduced and there is no rule or standard by which the judge can separate any good part of the verdict from the bad. In effect, the remittitur from $3,000,000 to $400,000 represents nothing more specific than the difference between the jury's and the judge's sense of "ethical indignation." The jury's verdict cannot be recognized in the final judgment.

I appreciate that in the federal courts the right to a jury trial is to be determined as a matter of federal law in diversity as well as other actions.[43] It is, however, both interesting and instructive to refer to Georgia law. The statute permitting the award of punitive damages,[44]

---

40. Minneapolis, St. P. & S. S. M. Ry. Co. v. Moquin, 1931, 283 U.S. 520, 51 S.Ct. 501, 75 L.Ed. 1243; Brabham v. State of Mississippi, 5 Cir. 1938, 96 F.2d 210; Ford Motor Co. v. Mahone, 4 Cir. 1953, 205 F.2d 267; National Surety Co. v. Jean, 6 Cir. 1932, 61 F.2d 197.

41. See Dimick v. Schiedt, 1935, 293 U.S. 474, 482–487, 55 S.Ct. 296, 79 L.Ed. 603.

42. See 6 Moore F.P. (2d ed.) ¶ 59.05(3); 3 Barron & Holtzoff ¶ 1305.1; 30 Am.Jur. New Trial, §§ 209, et seq.; 66 C.J.S. New Trial § 209, et seq.

43. Simler v. Conner, 1963, 372 U.S. 221–222, 83 S.Ct. 609, 9 L.Ed.2d 691; Ammons v. The Franklin Life Ins. Co., 5 Cir., 348 F.2d 414, decided June 28, 1965. Nonetheless, it does seem anomalous for the federal courts to require the state courts to accord the strictest guaranty of jury trial when indicated by a federal statute (e. g., the Federal Employers' Liability Act), and then, in a diversity case to refuse to recognize the requirement of jury trial imposed by a state statute.

44. Ga.Code Ann. § 105–2002, quoted supra p. 726.

says that "* * * *the jury* may give additional damages * * *." (Emphasis supplied.) Another statute prescribes: "The question of damages being one for the jury, the court should not interfere, unless the damages are either so small or so excessive as to justify the inference of gross mistake or undue bias." Ga.Code Ann. § 105–2015.

It has long been the law of Georgia that "[t]he trial judge has no power to order that, as a condition to the refusal of a new trial, a portion of the verdict shall be written off as excessive, except where, from the application of the law to the evidence, the excess can be accurately ascertained." Syllabus 4 by the Court, Central of Georgia Ry. Co. v. Perkerson, 1901, 112 Ga. 923, 38 S.E. 365, 53 L.R.A. 210. That action was for the death of a railroad employee. The plaintiff recovered a verdict for $10,-833.33. The trial court ordered a new trial conditioned on the plaintiff's consent to a remittitur of the part of the verdict in excess of $8,500.00, and, upon plaintiff's consent, entered judgment for that amount. On defendant's appeal, the Supreme Court of Georgia reviewed the authorities at length and reversed. A part of its opinion reads:

"It is manifest that the verdict for $8,500 was rendered by the judge, and not by the jury, and it is impossible to ascertain from the evidence in the case how he arrived at that exact amount. It is evident from his order that he was dissatisfied with the verdict, as to the amount of damages found, and that, if he had not thought he had the power of remitting a portion of the damages, he would have set the verdict aside and granted a new trial upon the ground that the verdict was excessive. The judge may have the power to determine that a verdict is grossly excessive, and for that cause to order it set aside, and yet have no power to fix the exact amount for which it should stand. 'The power to control does not include the power to find. Like the executive veto, it arrests, but does not by its exercise bestow the power to enact.'"

Even more pertinent is a very recent case where the trial court, with plaintiff's consent, reduced the exemplary or punitive damages awarded by the jury from $4,000 to $1,500. The conditional judgment for new trial was reversed with directions that a new trial be granted. The Court said:

"In determining punitive or exemplary damages it is impossible to lay down any fixed rules for a precise mathematical calculation; 'and in every such case the amount of the finding must be largely in the power of the jury, who have no other guide but their enlightened consciences. To say, therefore, in such cases that this finding should not have exceeded a certain sum, is to invade their peculiar province, and to assume their functions; and to require a portion of the amount so found by them to be remitted, and the balance to stand as their verdict, seems to us unauthorized either by the words of the law, or by the precedents and practice in such cases.' Savannah, Florida & Western Ry. v. Harper, 70 Ga. 119, 123–124 [citing many other authorities].

"It is our wish to make it clear that nothing held here or in any of the authorities cited is subject to the inference that a trial judge is restricted in the exercise of his exclusive discretion to grant or deny a motion for new trial on the general grounds. We do emphasize that where the determining of the amount of a particular class of damages lies exclusively with the jury, the trial court must either grant or deny a new trial on the basis of the jury's award. The trial judge cannot condition the exercise of his discretion in granting or denying a new trial on an acceptance by the parties of a different sum selected by him."

City Motor Exchange v. Ballinger, 1964, 110 Ga.App. 496, 138 S.E.2d 925, 926–27.

The seventh amendment guarantees a right of trial by jury to the defendant as well as to the plaintiff. I cannot escape the conviction that by the remittitur in this case that right has been denied to the defendant.

Both because New York Times v. Sullivan is convincing that this case was tried upon fundamentally erroneous principles of law, and because the enormous award of punitive damages and the remittitur violate the defendant's constitutional rights, I would reverse the judgment of the district court. I therefore respectfully dissent.

## ON PETITION FOR REHEARING

### PER CURIAM:

As Curtis' petition for rehearing asserts that the waiver found by us is based on "alleged facts, most of which are outside the record", and upon "unsupported statements in Butts' brief, which for the most part are not true", we deem additional comment appropriate.

The burden of Curtis' brief, elaborated in the petition for rehearing, is that Times came like a bolt out of the blue, and no one either knew of, or could anticipate, that a state-created libel damage action was subject to or could be controlled by First Amendment freedom of speech constitutional limitations. Therefore, the argument runs, until Times there was no reason to assert the constitutional claim, and consequently it should not be held to the usual appellate consequence of failing properly to preserve the point.

Obviously this Court is not required to accept the mere assertions of Curtis. This Court has the duty of determining whether this contention of Curtis was well founded. While this partakes of factual evaluation in a sense, the question of waiver is a law problem—i.e., whether skilled counsel would reasonably think the contention to be plausible. Since Curtis did not seek to raise the

constitutional issues before verdict and judgment, it was entirely proper to look to the sources discussed in our original opinion in order to ascertain the pertinent facts. Until the filing by Curtis of its petition for rehearing, the statements in Butts' brief, referred to by Curtis, had not really been disputed. And now, after having given full consideration to the affidavits and to all other matters presently submitted by Curtis, we are still of the firm opinion that when all of the acts and conduct of Curtis' attorneys are tested in the light of reason, Curtis cannot sustain the proposition that its counsel were ignorant of a constitutional claim so as to be totally excused for the complete absence of any timely assertion of it.

To its petition for rehearing, Curtis attaches affidavits made by Philip H. Strubing, whose Philadelphia, Pennsylvania law firm of Pepper, Hamilton & Scheetz, is general counsel for Curtis; by T. Eric Embry, whose Birmingham, Alabama law firm represented the New York Times Company in the case brought against it by Sullivan (Times case), and also represented Curtis in the related libel cases brought against it in the United States District Court by Coach Paul Bryant;[1] and by Welborn B. Cody, who was lead trial counsel for Curtis in the Butts case. In general, the affidavits assert that Mr. Embry and his partner, Roderick Beddow, Jr., attended the trial of this Butts case as spectators only, were not consulted concerning trial strategy, and did not advise Mr. Cody concerning the constitutional questions they had raised in Times. Mr. Cody stated that "he was not aware of the constitutional issues being urged in (the Times) case."

There is no dispute that the lawyers who sat together at the Curtis counsel table during the Butts trial were representing Curtis either in this case or in the related Bryant libel suits pending in Alabama, so presumably they were all

---

1. Civil Actions Nos. 63–2–W and 63–166, brought in the Western and Southern Divisions respectively, of the Northern District of Alabama.

on Curtis' payroll. Unusual as it would be for them not to consult with one another concerning strategy and tactics during the two-week trial, we accept the statement that neither Mr. Embry nor Mr. Beddow informed Mr. Cody of the constitutional questions being raised in the Times case.

But what about Mr. Strubing? In his affidavit he stated that he participated actively in the preparation of the Butts case for trial, and that he also worked actively with Mr. Embry in the preparation of the related Bryant cases. He is also on the brief in our case and participated in the arguments.

■ Butts' response to the petition for rehearing refers us to the records of this Court, of which, of course, we may also take judicial notice. In Cause No. 21,152, The Curtis Publishing Company v. Honorable H. H. Grooms, United States District Judge for the Northern District of Alabama, Curtis sought a writ of mandamus to compel Judge Grooms to vacate his orders denying Curtis' motion for change of venue. That record reflects that on February 26, 1963 (one month before the Butts suit was filed) Mr. Strubing's law firm, together with the firm of which Mr. Embry and Mr. Beddow are members, signed and filed in the Alabama District Court a motion to dismiss the related libel action instituted by Bryant, on the grounds, among others, that:

"To subject this defendant to liability in the circumstances complained of would abridge the freedom of speech and of press in violation of the First Amendment to the Constitution of the United States, made applicable to the states by the Fourteenth Amendment to the Constitution of the United States * * *.

"To subject this defendant to liability in the circumstances complained of would be repugnant to the due process clause of the Fourteenth Amendment to the Constitution of the United States * * *."

In a later suit filed against Curtis by Bryant the same two law firms made identical contentions in a motion to dismiss signed and filed by each of them in the District Court on April 30, 1963, still more than three months before the trial of the Butts case.

If the First and Fourteenth Amendments were thought by Mr. Strubing and his law firm to be valid grounds for dismissal of the related Bryant cases in Alabama, why did they not assert them in the Butts case? By his own statement Mr. Strubing was an *active* participant in all three cases, so he certainly should have known what the rights of Curtis were. Although he now says that he was not aware of the constitutional defenses articulated by Times until that case was decided by the Supreme Court some six months after the trial of the Butts case, neither he nor his local counsel (Mr. Embry) considered a final decision in Times—or for that matter any other case—a necessary prelude to raising in the related Bryant cases, the constitutional claim previously asserted by Mr. Embry in Times.[2] And for good reason, at least ever since June 1962 when those who wished could see the handwriting on the wall, certainly as the moving finger followed the voice of Mr. Justice

---

2. That these constitutional claims were well preserved by these counsel in Times without the learning which was to come several years later through the words of the Times opinion is recognized by the Court itself: "The (Alabama trial) judge rejected petitioner's contention that his rulings abridged the freedoms of speech and of the press that are guaranteed by the First and Fourteenth Amendments." 376 U.S. 254, 263, 84 S.Ct. 710, 716.

The Alabama Supreme Court also recognized the assertion of these constitutional claims for it "rejected petitioner's constitutional contentions with the brief statements that 'The First Amendment of the U.S. Constitution does not protect libelous publications * * *.' [273 Ala. 656], at 676, 144 So.2d [25] at 40." 376 U.S. 254, 264, 84 S.Ct. 710, 717.

Black's celebrated "First Amendment 'Absolutes'; A Public Interview".[3]

Granted that the extra-judicial statements of a single Justice do not an opinion make,[4] the Court itself in Times treats this newly announced rule as a natural development of the constitutional propositions long recognized by its extensive writings on First Amendment freedom of speech rights.[5] Thus, it emphasized that the "general proposition that freedom of expression upon public questions is secured by the First Amendment has long been settled by our decisions." 376 U.S. 254, 269, 84 S.Ct. 710, 720. Announcing its rule, it referred to the "oft-cited statement of a like rule \* \* \* adopted by a number of state courts \* \* \* found in the Kansas case of Coleman v. MacLennan, 78 Kan. 711, 98 P. 281 [20 L.R.A.,N.S., 361] (1908)"—a decision then nearly half a century old.

Whatever may have been the reasons for invoking the First Amendment claim in the Alabama suits while remaining silent in Georgia, Curtis cannot sustain the proposition that it was unaware that a defendant in a libel action might assert the constitutional claim as a defense. Counsel for Butts make a persuasive suggestion that Curtis elected to defend this case on its plea of justification, rather than raise the jurisdictional, constitutional and other affirmative defenses[6] it had raised in the Alabama Bryant cases, in order to get the right to open and close the arguments.

Nor, as suggested in Judge Rives' dissenting opinion on denial of rehearing, do we consider that our action is at all inconsistent with the principle of law expressed for the Court by Judge Wisdom in Commissioner of Internal Revenue v. Chase Manhattan Bank, 5 Cir., 1958, 259

3. Justice Black and First Amendment "Absolutes"; A Public Interview, Edmond Cahn and Mr. Justice Hugo L. Black, 37 NYU Law Review 549 (June 1962). The background of the interview was the Justice's lecture entitled "The Bill of Rights", delivered at the New York University School of Law, February 17, 1960, published at 35 NYU Law Review 865 (1960). See, e.g.:

"CAHN: Do you make an exception in freedom of speech and press for the law of defamation? That is, are you willing to allow people to sue for damages when they are subjected to libel or slander?

"JUSTICE BLACK: My view of the First Amendment \* \* \* is that it said Congress should pass none of these kinds of laws. \* \* \* I have no doubt myself that the provision \* \* \* intended that there should be no libel or defamation law in the United States under the United States Government, just absolutely none so far as I am concerned. \* \* \*" (557)

" \* \* \*

"My belief is that the First Amendment was made applicable to the states by the Fourteenth. I do not hesitate, so far as my own view is concerned, as to what should be and what I hope will sometime be the constitutional doctrine that just as it was not intended to authorize damage suits for mere

words as distinguished from conduct as far as the Federal Government is concerned, the same rule should apply to the states.

" \* \* \*

"I am for the First Amendment from the first word to the last. I believe it means what it says, and it says to me, ' \* \* \* Government shall not attempt to control the ideas a man has. \* \* \* Government shall not abridge freedom of the press or speech. It shall let anyone talk in this country.' \* \* \* Let them talk! In the American way, we will answer them." (563)

4. They were shortly to be announced *ex cathedra* in his concurring opinion in Times, 376 U.S. 254, 293, 84 S.Ct. 710, joined by Mr. Justice Douglas and substantially echoed by Mr. Justice Goldberg (with Justice Douglas), 376 U.S. 254, 297, 84 S.Ct. 710.

5. See the extended annotations, The Supreme Court and the Right of Free Speech and Press, 11 L.Ed.2d 1116–1175; 2 L.Ed.2d 1706; 93 L.Ed. 1151.

6. These would include the conditional privilege recognized by § 105–709(6) of the Georgia Code concerning published statements relating to the "acts of public men in their public capacity". See Note 20, 376 U.S. 254 at 280, 84 S.Ct. 710.

F.2d 231, 238, cert. denied, 359 U.S. 913, 79 S.Ct. 589, 3 L.Ed.2d 575.[7]

 In that case the legal theories developed in this Court for the first time could be fairly disposed of on the record, and the opposing party was not prejudiced by the use of other theories.[8] However, here Curtis seeks a reversal so that a new record based on different theories may be made at another trial. The wholesome desire "to secure the just * * * determination of every action", neither

7. Actually, in this tax case the theory later developed for the first time in this court had been raised in the bank's petition filed in the lower court and agreed upon by both parties at the trial. The Court, in deciding to consider the development of the theory, stated that the "[t]ax liability as to the testamentary trust depends on whether Daniel's will put Marie to an election. *The question is in the case.* A just determination of the appeal requires us to decide it." (Emphasis supplied). This case involved the gift tax liability under three trusts created by the decedent, "Daniel", one of which was a testamentary trust of his residuary estate from which his wife, Marie, was to receive the income for life, the remainder to be divided among Daniel's descendants. In the Tax Court, the bank's petition stated that "the estate was still under administration and that 'no determination has yet been made as to whether or not the said Marie Elizabeth Moran has elected to take under the will' * * * that Marie's 'motive 'in not taking against the will was to benefit herself' ". At the trial the Commissioner and the bank agreed to assume that Daniel's will put Marie to an election and that Marie's receipt of income from the trust was sufficient to show that she had elected to take under the will. They differed only as to whether the effect of the election was that she had made a taxable gift. The Tax Court held that Daniel's will put Marie to an election and that Marie's "acquiescence" in the testamentary trust constituted a taxable gift. On appeal, for the first time in the case, the defendant made the assertion that Daniel's will did not purport to dispose of Marie's share and therefore she was not put to an election, thereby denying that Marie transferred her share of the community estate to the trust. In answer to the Commissioner's objection to the bank's new argument that Marie was not put to an election, and its contention that the taxpayer is not at liberty to urge as a ground for reversal a point not raised in the court below, the court states that "[i]ndeed, * * * the taxpayer invited error. * * * Worse, the invitation was accepted. But an appellant has no vested right in an opponent's error of law in the lower court—especially when the protesting appellant is the Commissioner of Internal Revenue * * * (who) owes a duty to all taxpayers * * * to see that the tax law is applied justly. * * * Federal procedure is moving away from what Pound calls 'the sporting theory of justice', Wigmore the 'instinct of giving the game fair play', and Arthur Vanderbilt the theory of procedure as 'a contest between two legal gladiators'. We are a Court 'to secure the just * * * determination of every action'. Rule 1, Federal Rules of Civil Procedure, 28 U.S.C.A. Daniel's will is in the record and speaks for itself. '(W)here, as here, the case below was tried, not upon any misapprehension of the facts, but upon a misapprehension of the effects of those facts in law, appellant may not be prevented from pressing here for the application, to the proven facts, of the correct principles of law.' * * * 'We see no reason why we should make what we think would be an erroneous decision, because the applicable law was not insisted upon by one of the parties.' "

See also Jack Ammann Photogrammetric Engineers, Inc. v. Commissioner of Internal Revenue (5th Cir. 1965) 341 F.2d 466, a tax case citing Commissioner of Internal Revenue v. Chase Manhattan Bank, in determining that since legal theories were there being urged "that can be fairly disposed of on the record before us, we do not consider that we should refuse to consider them merely because they were not urged in the Tax Court."

8. See Glavic v. Beechie, (5th Cir. 1964) 340 F.2d 91. The majority refused to consider a question not presented for determination in the District Court. Judge Wisdom in his concurring opinion stated, in opposing this decision, that he "would allow either party on appeal to advance a new theory or to change his theory of the case—if: (1) all the relevant evidence is before the Court, (2) the opposing party has had adequate time to brief the point, and (3) the opposing party is not prejudic(ed) by not having introduced evidence below that would have militated against the validity or effect of the new theory."

dispenses with the rules of procedure, nor forecloses the applicability of the doctrine of waiver when all of the elements which constitute that doctrine are present, as in the present case.

As to all other contentions in the petition for rehearing and supporting brief, we adhere without further comment to the holdings in our original opinion. Finding no error, see Rule 25a of this Court, the petition for rehearing is denied.

Petition denied.

RIVES, Circuit Judge, dissenting:

The majority undertakes to bolster its holding "that Curtis has clearly waived any right it may have had to challenge the verdict and judgment on any of the constitutional grounds asserted in Times."[1]

## I.

As suggested in my earlier dissent,[2] that is not true as to the holding in Times that a state law of civil libel which sustains the imposition of extremely large awards of damages in libel actions may constitute a prior restraint on freedom of expression forbidden by the First and Fourteenth Amendments. New York Times Co. v. Sullivan, 1964, 376 U.S. 254, 277, 278, 84 S.Ct. 710, 11 L.Ed.2d 686.

The enormous amount of the verdict in the present case could not have been anticipated. Curtis raised the point seasonably as a ground for its first motion for new trial.[3]

In ruling on that motion the district court recognized that: "As far as this Court can ascertain, the largest award ever sustained for punitive damages by the Appellate Courts was an award of $175,000.00 in the case of Reynolds v. Pegler, D.C., 123 F.Supp. 36; 2 Cir., 223 F.2d 429." 225 F.Supp. 916, at 919. Nonetheless, after the plaintiff filed his remittitur, the district court entered judgment against Curtis for $400,000 punitive damages plus $60,000 general damages, or a total of $460,000. Since that time, Curtis has lost no opportunity to insist that the $460,000 award, if sustained, is so large as to constitute a prior restraint upon freedom of the press within the rule announced in the Times decision. On that issue, there is, I submit, no debatable question of waiver. For reasons expressed in my prior dissent,[4] I would rule with Curtis on that issue.

As to the punitive damage award, the section of the Georgia Code quoted in my earlier dissent[5] and the oral charge to the jury,[6] make clear that the very purpose of punitive damages is to act as a deterrent to future conduct, which, in libel cases, means a prior restraint on freedom of expression. When that deterrent or restraint assumes proportions of the jury's verdict, $3,000,000, or even of the award made by the district court, $400,000, I submit that it is forbidden by the First and Fourteenth Amendments.[7]

The part of the Times opinion relating to prior restraints on freedom of expres-

---

1. Pp. 726 and 728.

2. Pp. 726 and 728.

3. "That portion of the jury's verdict awarding the plaintiff $3,000,000 punitive damages, violates and abridges and cannot be sustained without violating and abridging the right of freedom of speech and of the press guaranteed by the First and Fourteenth Amendments of the United States Constitution because:
 " * * *
 "(e) The amount of punitive damages, in the circumstances of this case, was so excessive. as to violate and abridge through excessiveness alone, the guarantees of free speech and press." (Record, pp. 46, 47.)

4. P. 728.

5. Section 105–2002, Georgia Code Annotated.

6. "The purpose of punitive damages is to deter the defendant from a repetition of the offense and is a warning to others not to commit a like offense. It is intended to protect the community and has an expression of ethical indignation, although the plaintiff receives the award."

7. See Bantam Books, Inc. v. Sullivan, 1963, 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584, cited in Times (376 U.S. at 278, 84 S.Ct. at 725).

sion was certainly not "new law." Nor was that part of the opinion limited to public officials. Clearly, I submit, whether Butts was a public official or not, the enormous award of damages must be set aside.

## II.

The specific holding in Times, which had not theretofore been generally recognized, was that a State cannot under the First and Fourteenth Amendments award damages to a public official for defamatory falsehood relating to his official conduct unless he proves "actual malice"—that the statement was made with knowledge of its falsity or with reckless disregard of whether it was true or false. It was that principle to which I referred in my earlier dissent,[8] when I said "it was not even enunciated by the counsel who petitioned for certiorari in the New York Times Co. decision."[9] Now on petition for rehearing, counsel makes affidavit that: "The requirement of the New York Times case that general damages could not be awarded without the necessity of proof of actual malice on the part of the defendant was not specifically presented in the Alabama courts nor in the petition for certiorari to the United States Supreme Court."

In order properly to object[10] to the district court's instructions allowing recovery of general damages without proof of malice, and recovery of punitive damages on a definition of malice at variance with that prescribed in Times, counsel must have anticipated that specific holding of the Times decision.

Judge Morgan, the District Judge in the present case, recognized, at least impliedly, that Curtis had not waived that constitutional right by its failure to insist upon it at the trial, when, in denying the motion for new trial under Rule 60(b), Fed.R.Civ.P., he considered and ruled on the defense on its merits. Butts v. Curtis Publishing Co., N.D. Ga. 1964, 242 F.Supp. 390.

Based largely on facts dehors the present record, the majority held that Curtis' trial counsel had knowingly and intentionally waived the constitutional protections afforded by the Times case, by failing to raise them at the trial. In response to that holding, three of Curtis' attorneys have filed with this Court their sworn affidavits.[11] Now the majority goes still further beyond the present record and considers another case shown by the records of this Court but of which Judge Morgan could not have taken judicial notice when he considered and ruled on Curtis' section 60(b) motion. With deference, I submit that it is the function of this Court simply to review the ruling of the district court on the record before that court.

If, however, we are to resort to evidence out side the record and to bolster our judicial notice from records in other cases, those extraneous matters do not impugn the integrity and veracity of Curtis' trial counsel. It seems clear to me that, at the time of trial, counsel had no notice of the *specific* holding thereafter made in Times. It is impossible for me to believe that, if counsel had any such notice, they would have knowingly and intentionally waived the specific constitutional protection afforded by the Times case "in order to get the right to open and close the arguments," as suggested in the majority opinion.

It is too much to hold counsel to the duty of anticipating the specific holding of Times, because of general assertions of First Amendment defenses in other cases, or even because of Mr. Justice

8. P. 723.

9. An opinion which I had reached from an examination of the petition and briefs on certiorari.

10. "No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection." Rule 51, Fed.R.Civ.P.

11. Ethically permissible "when essential to the ends of justice." A.B.A. Canons of Prof. Ethics No. 19.

Black's view that the First Amendment " * * * intended that there should be no libel or defamation law in the United States under the United States Government, just absolutely none so far as I am concerned * * *." [12] The majority paints with such a broad brush as to require the assertion of a First Amendment defense in *every* libel or defamation case hereafter litigated.

With deference, I submit that it is the outworn sporting theory of justice [13] which leads the majority to convert this appeal into an unseemly trial of Curtis' lawyers. The function of this Court is not to decide a contest, but to administer justice. Curtis, not its lawyers, stands mulcted in damages to the extent of $460,000 as the result of a trial conducted on a fundamentally and constitutionally deficient theory of law.

The resulting damage extends far beyond the monetary loss to Curtis. This Court's refusal to consider and decide whether constitutional standards were observed in adjudging Curtis liable is a grave reflection upon the administration of justice itself. Permitting such a libel judgment to stand will cause " * * * the pall of fear and timidity [to be] imposed upon those who would give voice to public criticism in an atmosphere in which the First Amendment freedoms cannot survive." [14]

A just determination requires this Court to consider and decide this appeal on its merits.[15] The altered situation created by the intervening decision of the Supreme Court makes that a compelling duty.[16]

I, therefore, respectfully dissent.

12. Quoted in footnote 3 to the majority opinion on rehearing.

13. "Federal procedure is moving away from what Pound calls 'the sporting theory of justice', Wigmore the 'instinct of giving the game fair play', and Arthur Vanderbilt the theory of procedure as 'a contest between two legal gladiators'. We are a Court 'to secure the just * * * detemination of every action'. Rule 1, Federal Rules of Civil Procedure, 28 U.S. C.A." Commissioner of Int.Rev. v. Chase Manhattan Bank, 5 Cir. 1958, 259 F.2d 231, 238.

14. New York Times Co. v. Sullivan, 1964, 376 U.S. 254, 278, 84 S.Ct. 710, 725, 11 L.Ed.2d 686.

15. Hormel v. Helvering, 1941, 312 U.S. 552, 556, 557, 61 S.Ct. 719, 85 L.Ed. 1037.

16. The Peggy, 1801, 5 U.S. (1 Cranch) 103, 110, 2 L.Ed. 49; Connor v. New York Times Co., 5 Cir. 1962, 310 F.2d 133, 135, and cases there cited.