[DO NOT PUBLISH]


IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-12764
Non-Argument Calendar
_____

D.C. Docket No. 8:14-cv-03022-SCB-AEP


BRANDY WALLACE,
as the Personal Representative of the
Estate of Ronald Wesley Sexton,

                                        Plaintiff-Appellant,


versus


NICOLO MANGIARACINA,
Officer, individually,
NICOLO MANGIARACINA,
Officer, as a member of St. Petersburg Police Department,
JUSTIN MORALES,
Officer, individually,
JUSTIN MORALES,
Officer, as a member of St. Petersburg Police Department,
MICHAEL ROMANO,
Officer, individually,
MICHAEL ROMANO,
Officer, as a member of St. Petersburg Police Department,
ANTHONY HOLLOWAY,
Chief, St. Petersburg Police Department Chief,
CITY OF SAINT PETERSBURG,
d.b.a. City of St. Petersburg Police Department,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(August 14, 2018)

Before ED CARNES, Chief Judge, WILLIAM PRYOR, and ANDERSON, Circuit Judges.

PER CURIAM:

After Ronald Sexton was shot and killed during an encounter with three police officers, the personal representative of his estate, Brandy Wallace, brought a 42 U.S.C. § 1983 action against the three officers, the police chief, and the city of St. Petersburg, Florida.  She alleged Fourth Amendment excessive force claims against the three officers and related state law claims against all defendants.  The case proceeded to trial, and a jury returned a verdict in favor of the defendants on all claims.  Wallace contends that the district court should have granted her motion for a new trial based on allegedly improper statements that defense counsel made in his closing argument.

Early in the morning of September 2, 2013, Andrea Robinson called 911 to report that her boyfriend, Cedric Warren, had gotten into an argument with Sexton.  Warren then spoke with the dispatcher and said that Sexton had shown him a handgun but had not pointed it at him.  Warren also told the dispatcher that,

according to Sexton's wife, Sexton had been drinking.  Robinson got back on the phone with the dispatcher and said that she could see Sexton standing in front of his house, talking on his cell phone, and that she saw him load the gun and put it in his pocket.  The dispatcher relayed all of that information to the responding officers.

Three officers arrived on the scene and found Sexton, still talking on the phone, on the front porch with his ten-year-old son Joshua.[1]  Joshua ran inside the house as the officers approached.  The officers and Joshua were the only witnesses to the shooting, and the jury heard different accounts of what happened.

The officers told Sexton to put his hands up and then told him to lower himself down to the ground and lay on his stomach with his arms stretched out away from his body.  At one point, Sexton began reaching toward his pocket, and an officer told him to stop; Sexton complied, put his hands back up, and started lowering himself to the ground.  But then, according to the officers, Sexton suddenly retrieved the gun from his pocket and pointed it at one of the officers.  A split second after Sexton raised his gun and pointed it at the officer, the three officers fired their weapons, and Sexton was killed.

Joshua told the jury a different version of events.  He stated that after he ran inside the house, he went upstairs and looked out the window and could see his dad

---

[1] Two other officers also responded to the scene, but Wallace did not name them as defendants.

and the police.  According to Joshua, the police were telling Sexton to get down and he complied.  Joshua testified that as Sexton got down, he threw his gun off the porch, but then the officers shot him.  After that, Joshua left the window and ran to get his mom.

In his closing argument, Wallace's counsel argued that the officers "violated the rules of engagement" and "commit[ed] abuses of power when they violated the very rules they train on."  Counsel also stated that he would not "argue that [one of the officers was] an assassin, that he [killed Sexton] out of cold blood and hatred, because that's not what the case is about," but the case "is about holding [the officers] accountable for violating the rules."  He also stated that the officers' strategy during the case was to attack the credibility of Joshua and that the officers "[came] up with a story about how [Joshua] made [up] a story" about the shooting.

In response, defense counsel said the following in his closing argument:

> But make no mistake, let's not sugarcoat things, they're accusing those officers of cold blooded murder.  Shooting an unarmed man.  And not only that, getting — conspiring with two other officers — five of them — to lie about it and cover it up.  Let's not sugarcoat it.  That's what they're claiming.  That's what they're claiming.
>
> Before we say [the officers] murdered an unarmed man and lied about it, before we're willing to look them in the face and say that, don't you want to see just a little more than that?  I mean, wouldn't we expect just a little more than that before we said yeah, you've proved it.

4

So again, are we going to say these three officers are murderers and those five officers are liars . . . ?  Or would you rightly expect more?  Prove it.

Defense counsel also referred to the lack of any expert medical or ballistics testimony, or any expert testimony about how the officers violated their training or acted improperly.  He also emphasized inconsistencies in Joshua's version of the shooting.  Finally, he told the jury that if the jury believed in its "heart of hearts" that Sexton was pointing his gun at the officers, then they should find for the officers.  Wallace did not object to any of those statements, either when defense counsel made them or at the end of his closing argument.

After the jury found for the defendants, Wallace filed a motion for a new trial based on defense counsel's statements during closing argument.  The district court denied that motion.  The court, citing Wallace's failure to object to any of the statements during closing argument, ruled that a timely objection would have allowed the court to consider the impact of the statements and give a curative instruction if necessary.  And the court also ruled that, in any event, the statements did not warrant a new trial.

"Ordinarily an appellate court does not give consideration to issues not raised below."  Burch v. P.J. Cheese, Inc., 861 F.3d 1338, 1352 (11th Cir. 2017) (quotation marks omitted).  But in "an exceptional civil case, we might entertain the objection by noticing plain error."  Id. (quotation marks omitted).  "[A] finding

5

of plain error is seldom justified in reviewing argument of counsel in a civil case."

Oxford Furniture Cos., Inc. v. Drexel Heritage Furnishings, Inc., 984 F.2d 1118,

1128 (11th Cir. 1993) (quotation marks omitted).  Wallace contends that defense

counsel's references to murder and conspiracy, the lack of expert testimony, and

the inconsistencies in Joshua's story were inflammatory, improper, and amounted

to plain error.  She argues that references to those crimes suggested to the jury that

Wallace bore the higher burden of proof (beyond a reasonable doubt) required in a

criminal trial.  Finally, she argues that objecting during closing argument would

have done more harm than good by emphasizing the prejudicial nature of the

statements and antagonizing the jury.[2]

The district court did not err, plainly or otherwise, in denying Wallace's

motion.  Wallace's failure to object to the statements either during closing

argument or right after argument ended undermines any claim that those statements

were so prejudicial as to warrant a new trial.  See id. at 1129 (holding that

statements made during closing argument did "not rise to the level of plain error"

in part because "the fact that [the defendants], while now claiming severe prejudice

because of the argument, made no attempt to object to the arguments when they

---

[2] Wallace asserts that she meets an exception to the rule requiring a timely objection, but we do not consider that argument because she raises it for the first time in her reply brief.  See Sapuppo v. Allstate Floridian Ins. Co., 739 F.3d 678, 683 (11th Cir. 2014) ("We decline to address an argument advanced by an appellant for the first time in a reply brief.") (quotation marks omitted).

were made."); see also Curtis Publ'g Co. v. Butts, 351 F.2d 702, 714 (5th Cir. 1965) ("If, as Curtis' counsel now claim, the arguments were, among other things, grossly improper and inflammatory, intemperate and inexcusable, appeals to passion and prejudice, corruptions of the evidence, completely unsupported by the evidence, and unsworn testimony of counsel, it is inconceivable to us that they would have delayed so long without raising the slightest hint of an objection.") (quotation marks omitted).[3]

Even if Wallace had objected, the statements, taken in their proper context, did not warrant a new trial.  See Allstate Ins. Co. v. James, 845 F.2d 315, 318 (11th Cir. 1988) (stating that an "appellate court will look to the entire argument [and] the context of the remarks" to determine whether statements made during oral argument are improper).  The officers referred to "murderers" to rebut Wallace's argument that she was not accusing the officers of being assassins.  There is no support for Wallace's argument that the jury was confused as to the proper burden of proof, as the district court instructed the jury that Wallace had to prove her claims by a preponderance of the evidence.  And we "must presume that juries follow their instructions." Johnson v. Breeden, 280 F.3d 1308, 1319 (11th Cir.

---

[3] Wallace relies on the Fifth Circuit's decision in Edwards v. Sears, Roebuck & Co., 512 F.2d 276, 285 (5th Cir. 1975), where, despite the lack of any objection, the court ordered a new trial because of statements made during closing argument.  But in that case counsel used "closing argument[ ] to bring before the jury damaging facts not in evidence and never established." Id. at 284.  That did not happen here.

7

2002).  The remaining statements about the lack of expert testimony and the

inconsistencies in Joshua's statements were permissible comments on the evidence

at trial.  As a result, the district court did not err, plainly or otherwise, in denying

Wallace's motion for a new trial.[4]

**AFFIRMED.**

---

[4] Wallace also argues that the district court improperly excluded three recorded interviews with Joshua.  At the end of Wallace's case-in-chief, the court denied the admission of those recordings, but stated that it might reconsider its decision when Wallace presented her rebuttal case.  During Wallace's rebuttal case, she asked to play only one of the recordings, and the court admitted that recording into evidence.  The court also stated that it would be open to playing the other recordings so that, out of an "abundance of fairness," the jury could hear them all.  Because Wallace did not seek to admit the other recordings at that point, her argument fails.

Wallace filed a motion to supplement the record with several exhibits, including an audio recording and transcript of Joshua's interview with a detective.  A judge of this Court denied that motion as to all the exhibits except the interview recording and transcript because the other exhibits were already in the record, and the motion was carried with the case as to the recording and transcript.  What is left of that motion is now **DENIED AS MOOT**.